UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
CIVIL ACTION NO. 1:20-CV-00130

In re:

V.R. KING CONSTRUCTION, LLC,

      Debtor,

Y2 YOGA COTSWOLD, LLC,

      Plaintiff,

v.

V.R. KING CONSTRUCTION, LLC;
VINROY REID; A. BURTON SHUFORD
as Chapter 7 Trustee for V.R. KING
CONSTRUCTION, LLC and VINROY
REID,

      Defendants.

Case No. 18-31635
Chapter 7

Adversary Proceeding No. 19-03047

## <u>AFFIDAVIT OF ATTORNEY CHRISTOPHER CAMPBELL</u>

Christopher J. Campbell, being first duly sworn, and upon his oath, deposes and says as follows:

1.      I am over the age of eighteen and competent to make this Affidavit.

2.      I have been a licensed and practicing attorney in North Carolina since September 2012.

3.      My North Carolina Bar Number is 44277.  I am a member of the Mecklenburg County Bar.  I am admitted to practice in the United States District Court for the Western District of North Carolina.

4.      I am presently a member-attorney at McAngus, Goudelock & Courie, PLLC.  At
the time of the subject litigation detailed herein, I was a senior associate.

5.      Any statement made herein is made upon information and belief, even if such
statement is not directly preceded by the express reservation.

6.      At any time, from roughly 2013 to present, approximately 75 percent or more of
my caseload is directly related to construction and/or commercial litigation.  Such
cases involve: construction defect defense, commercial general liability insurance
coverage, and the prosecution or defense of contract collection actions, inclusive
of lien claims pursuant to Chapter 44A of the North Carolina General Statutes.
My practice is not limited to defense-only litigation.

7.      I represented Vinroy Reid and his respective corporate entities regarding the
Mecklenburg County Superior Court Case, case no. 16-CVS-23179, entitled, "Y-
2 Yoga Cotswold, LLC v. Vinroy W. Reid, et al." from roughly March 2017
through the entry of a Final Judgment on or about February 8, 2019.   I am not
presently counsel for Mr. Reid or his respective corporate entities.    The Final
Judgment from the underlying state court action is attached hereto as "**Exhibit
"A.**"

8.      I have not been intimately involved in this case or acting as counsel of record
since March 2019.  In the interest of candor with the Court, there may exist
exhaustive briefing, exhibits, arguments, caselaw, or new testimony that I have
not been able to review, witness or assess since my last involvement in the
litigation between these parties.

9.      I humbly submit this Affidavit to the Court with great respect, and I acknowledge that I may not be privy to all issues raised by the parties.

10.     My general understanding is that Y-2 Yoga Cotswold, LLC is currently seeking attorneys' fees before this Court, allegedly arising from a breach of a construction contract, the indemnity provision therein, and pursuant to N.C. Gen. Stat. § 6-21.6.

11.     Upon information and belief, Y-2 Yoga Cotswold, LLC has already litigated this issue and/or failed to appropriately raise or preserve this issue before the trial judge, the Honorable Judge Donnie Hoover, during trial and during post-verdict, post-trial motions.   See Ex. A, see also **Exhibit "B,"** attached hereto, Order on Post Verdict Motions, February 8, 2019.

12.     Y-2 Yoga Cotswold, LLC incorporated the alleged construction contract and the indemnity provision into its pleadings and counts for breach of contract. See e.g., **Exhibit "C,"** attached hereto, Amended Complaint, 14-CVS-23138 ¶¶ 23-27 (Breach of Contract Count), specifically ¶ 27 ("Y-2 Yoga demands interests costs and attorneys' fees in accordance with provisions of the Contract and applicable law"), filed on or about January 27, 2015.   See also **Exhibit "D**," Second Amended Verified Complaint 16-CVS-23179 ¶¶ 110-115, specifically ¶ 114 ("Y-2 Yoga also seeks payment of all other amounts it is entitled to under the construction contract terms and applicable law, including but not limited to interest, costs, and attorneys' fees."), filed on or about March 6, 2018.

13.    Y-2 Yoga Cotswold, LLC submitted the breach of contract issues to the jury, and

the jury awarded the principal damage sum pursuant to breach of contract as of

November 2018.  Notwithstanding, the Final Judgment was entered on or about

February 8, 2019.   The total amount of damages determined by the jury in the

controversy was $396,649.57.  See Ex. A.

14.    The moment that the jury returned a verdict in Y-2 Yoga Cotswold, LLC's favor

in early November 2018, Y-2 Yoga Cotswold, LLC knew that the Reid

Defendants were a "breaching party" under the construction contract.  Y-2 Yoga

Cotswold, LLC had also alleged that the Reid defendants were the "breaching

party" dating back to 2014.

15.    Y-2 Yoga Cotswold, LLC knew it could pursue post-verdict and post-trial

motions with Judge Hoover—and it did.    Post-verdict motions were heard by

Judge Hoover on or about November 30, 2018.    Y-2 Yoga Cotswold, LLC's

post-verdict motions included statutory costs, pre-judgment interest on the

principal damages, among others. See Ex. B.  Y-2 Yoga Cotswold, LLC knew or

should have known its alleged accumulation of fees from 2014 through November

30, 2018, but failed to submit a request for recovery of the same during the post-

verdict motions.  In addition, as the parties were awaiting Judge Hoover's entry of

the Final Judgment and contemporaneous post-verdict motions, Y-2 Yoga

Cotswold, LLC knew or should have known its alleged accumulation of fees from

2014 through February 8, 2019—the date of the entry of the Final Judgment.  See

Exs. A and B.

16.     Y-2 Yoga Cotswold, LLC failed to present the issue of attorneys' fees to the trial judge who had spent nearly two months (spanning through September 2018, October 2018 and November 2018) with counsel in trial, and who would have been able to determine, in his discretion, whether Y-2 Yoga Cotswold, LLC was entitled to reasonable attorneys' fees considering all 13 factors, and making findings regarding the same, under N.C. Gen. Stat. § 6-21.6.

17.     Upon information and belief, Y-2 Yoga Cotswold, LLC either chose to wait to on the indemnity issue before this Court—hoping it would receive a more favorable venue after observing Judge Hoover's rulings for the length of trial; or, in the alternative, Y-2 Yoga Cotswold, LLC simply forgot to present the issue to the trial judge while it was focusing on other directed verdict motions or post-verdict motions.

18.     In either event, Y-2 Yoga Cotswold, LLC now appears to be in the position to take two or more bites at the apple.  In the trial court, Y-2 Yoga Cotswold, LLC knew to make its post-verdict motions to Judge Hoover regarding his assessment of costs and pre-judgment interest.   See Exs. A and B.

19.     Upon information and belief, in addition, Judge Hoover also needed to make the specific factual determination on post-verdict motions concerning the date of breach of the contract that was disputed by these parties.  Upon information and belief, Plaintiff argued in favor of January 15, 2014 as the date of breach. Defendants argued for April 29, 2014.  Upon information and belief, based on the exhibits, Judge Hoover may have ruled as early as October 31, 2013 (the date of a disputed concrete pour) or as late as April 29, 2014 (a Notice of Default Letter

from Attorney Greg Shelton).   Notwithstanding, Judge Hoover had intimate knowledge of the facts of the case as it was being presented in real-time by the parties, and he made his determination, accordingly.

20.   Despite the trial court's intimate knowledge of these issues, and the incorporation of the indemnity clause into all of the contract claims made throughout the pleadings in the 2014 case and the 2016 case, Y-2 Yoga Cotswold, LLC did not present the issue of attorneys' fees to the trial judge.

21.   I am aware that Edwards v. Edwards, 118 N.C. App. 464, 456 S.E.2d 126 (1995) is a case that is cited for the proposition that attorneys' fees may be sought in a separate indemnity action, which does not accrue until after an original judgment.   See Exhibit "E," for a copy of Edwards, attached hereto.   Edwards, however, is not a construction case.   In Edwards, a plaintiff, ex-husband, filed an action against a defendant, ex-wife.   The plaintiff sought specific performance regarding a separation agreement.   At the trial level, the Davidson County District court ruled, in an April 20, 1993 judgment, that the separation agreement was valid and that the defendant was the breaching party.   The separation agreement concerned the specific performance for the sale of real property.   Upon information and belief, no monetary damages were awarded in the underlying judgment.   Subsequently, there was an order related to a July 7, 1993 motion by the plaintiff for attorneys' fees arising from an indemnity provision in the separation agreement.

22.   Significantly, Edwards observes that indemnity generally relates to liability for derivative fault (i.e. an obligation to a third party).   See Edwards, 118 N.C. App. at 467, 456 S.E.2d at 128 (citations omitted).

23.   Derivative liability is common in the construction context.  North Carolina's caselaw is littered with examples where a project owner brings an action against a general contractor and secures a monetary judgment against the general contractor. The general contractor then, within one year of the judgment, seeks indemnity from its subcontractors—i.e. third-parties.  See e.g., Kaleel Builders, Inc. v. Ashby, 161 N.C. App. 34, 587 S.E.2d 470 (2003) (following arbitration in favor of the homeowners, a general contractor was defending against dispositive motions presented by its subcontractor trades, who were added after arbitration).

24.   The context of Edwards is completely distinct from the construction and/or commercial case before this Court.  In Edwards, the separation agreement did not involve an underlying dispute to determine monetary damages. The action sought specific performance more akin to a declaratory judgment action.   Upon information and belief, there was not a jury verdict in Edwards.  Further, there were not post-verdict or post-judgment motions for costs or prejudgment interest—according to the recitation of the issues below in the Edwards opinion.

25.   Edwards holds, with respect to collateral estoppel, that the trial court "determined only the validity of the Agreement and plaintiff's entitlement to specific performance. Plaintiff has not endeavored to relitigate these matters, but rather the separate and distinct issue of recoupment of attorneys' fees under the indemnity clause of the agreement."   Unlike Edwards, in the instant case, there was a determination of monetary damages under the contract, for a specific amount. Further, unlike Edwards, there was a specific determination of costs in post-

7

verdict motions before the trial judge.  Y-2 Yoga Cotswold, LLC had ample opportunity to present its attorneys' fee claims—whether by statute, by contract, or a combination of both, to Judge Hoover in the underlying trial, and they failed to do so. Y-2 Yoga Cotswold, LLC appears to be relitigating issues that are directly incorporated into its breach of contract claims in every iteration of its pleading.  Y-2 Yoga Cotswold, LLC appears to have split discretionary decisions which typically reside within the discretion of the trial judge.  Y-2 Yoga Cotswold, LLC submitted the concerns in its indemnity agreement, including claims, damages, court costs and interest post-verdict to Judge Hoover, but Y-2 Yoga Cotswold, LLC omitted the presentation of its attorneys' fees.

26.    With respect to res judicata, <u>Edwards</u> observed that the presentation of an indemnity claim is not precluded prior to accrual—post trial.  <u>See Edwards</u>, 118 N.C. App. at 471, 456 S.E.2d at 130 (citing <u>Heath v. Board of Commissioners</u>, 292 N.C. 369, 375-76, 233 S.E.2d 889, 893 (1977)).

27.    Significantly, in its rationale, <u>Edwards</u> also observes that prior caselaw has held that *res judicata* was not applicable where the performance of an act sought in one action was distinct from a money judgment sought in another action. <u>See Edwards</u> 118 N.C. App at 473, 456 S.E.2d at 131 (citing <u>Shelton v. Fairley</u>, 72 N.C. App. 1, 5, 323 S.E.2d 410, 416 (1984)).  In other words, in <u>Edwards</u> and <u>Shelton</u> a money judgment was not sought in the underlying action.

28.     In every other action cited by <u>Edwards</u> in which attorneys' fees were brought after the principal action and money judgments were sought in the underlying action, none involve a construction contract, indemnity provision or cross-cutting fee provision.  The examples cited by <u>Edwards</u> include statutory provisions for an unwarranted refusal to settle by an insurance carrier; attorneys' fees in alimony cases; attorneys' fees concerning custody and child support; an unsuccessful will caveat proceeding; and, the contest of an agency decision concerning the denial of food stamps. <u>Edwards</u> 118 N.C. App at 473-74, 456 S.E.2d at 131-32 (citations omitted).

29.     In the case before this Court, the language of the subject construction agreement is more consistent with <u>Edwards</u> observation that indemnity generally relates to liability for derivative fault (i.e. an obligation to a third party) rather than in line with <u>Edwards</u>' more narrow holding that *res judicata* did not prohibit the motion for attorneys' fees following a specific performance determination.  <u>See</u> <u>Edwards</u>, 118 N.C. App. at 467, 456 S.E.2d at 128 (citations omitted).

30.     Here, the "Y2 Yoga Expansion Construction Agreement," dated August 5, 2013, is governed by North Carolina law. <u>See</u> Section 6(c). Section 3(b) states "<u>Indemnities</u>.  The parties hereto agree to indemnify and hold harmless the non-breaching party against any claims, damages or penalties (including court costs and outside legal fees reasonable incurred) arising out of the breaching party's breach **or alleged breach of any agreement**, representation and warranty in this agreement.  Notwithstanding anything to the contrary contained herein, the forgoing indemnity shall apply to those third party claims arising from General

Contractor's oversight or negligence pertaining to operational, legal and/or financial matters."  (emphasis added).

31.     The first sentence of the indemnity provision, if read literally, is problematic for Y-2 Yoga Cotswold, LLC.  The provision specifically includes the "alleged breach of any agreement . . . in this agreement."  Thus, if the contract and this Section is enforceable, then Y-2 Yoga Cotswold, LLC's argument concerning the need to wait until indemnity accrues by way of the determination of a "breaching party" is not correct.  The "alleged breach" triggered this provision back in 2014. Read literally, Y-2 Yoga Cotswold, LLC failed to raise this issue at the trial court with Judge Hoover even though Y-2 Yoga Cotswold, LLC knew it had alleged a breach in 2014, and Y-2 Yoga Cotswold, LLC incorporated this contract into all of its pleadings from 2014.

32.     Another way of reading the first sentence of the indemnity provision is that it is barred under N.C. Gen. Stat. § 22B-1 (2015).  Under this statute, a party is not entitled to indemnity for its own fault in part or in whole.  If the indemnity provision is taken on its face, the first sentence purports to hold either party harmless for "any alleged breach," which necessarily includes alleged breaches of contract asserted by the Reid Defendants against Y-2 Yoga Cotswold, LLC in 2014.  As drafted, this provision is overly broad and purports to hold both parties harmless for "any alleged breach."  As drafted, the agreement is void on its face.

33.     In either event, the "alleged breach" requirement in the indemnity provision either makes the provision void on its face and/or it triggered Y-2 Yoga Cotswold, LLC's alleged indemnity and hold harmless claim back in 2014 without the need for a judgment to determine "breach of contract" in 2018.

34.     In addition, the second sentence of the indemnity provision cannot not be ignored in this analysis. The second sentence clearly explains how an indemnity agreement is intended to operate within the context of a construction project concerning derivative liability. The sentence reads, "Notwithstanding anything to the contrary contained herein, **the forgoing indemnity shall apply to those third party claims** arising from General Contractor's oversight or negligence pertaining to operational, legal and/or financial matters." (emphasis added).

35.     The second sentence is not severable from the first sentence because it specifically states, "the forgoing indemnity," in direct reference to the preceding indemnity clause. But, even if there is an argument that it could be severable, or a court decides to "blue-pencil" the paragraph to save the preceding provision, the second sentence demonstrates the intent of the parties. And, the intent is consistent with derivative liability in the context of the construction industry.

36.     If the subject Section 5 of the construction agreement is somehow not informed by its own term concerning "alleged breach," its own term concerning "forgoing indemnity," or its own term concerning "third party claims," and the Section is construed only as a mutual attorneys' fees provision under N.C. Gen. Stat. § 6-21.6, then Y-2 Yoga Cotswold, LLC's claims are still limited by the application of § 6-21.6.

37.     Pursuant to N.C. Gen. Stat. § 6-21.6 (f), the award of attorneys' fees may not
        exceed the amount in controversy.  The amount in controversy was determined by
        the jury.  I cannot recall the specific amount presented to the jury by Plaintiff, but
        I believe it was in excess of $1.4 million, and perhaps over $2.1 million, with the
        alleged lost profit arguments.  The jury determined the amount in controversy was
        $396,649.57.   Y-2 Yoga Cotswold, LLC's currently sought attorneys' fees should
        not exceed $396,649.57.

38.     Upon information and belief, one of the more frequently cited cases for the
        application of N.C. Gen. Stat. § 6-21.6 is <u>Legacy Data Access, Inc. v. Cadrillion,</u>
        <u>LLC</u>, 889 F.3d 158, 162 (4th Cir. 2018) (applying North Carolina substantive
        law).  In <u>Legacy</u>, attorneys' fees were already determined once in the trial court
        below prior to the 4th Circuit remanding, in part, for a determination of contract
        damages in a new trial, and for the court's reassessment of the proper amount of
        fees.  Specifically, the fees could change dramatically because of the requirement
        under § 6-21.6 for an assessment of the results obtained and to the extent to which
        the prevailing party succeeded compared to other factors under the statute.
        Notably, this assessment does not add statutory costs or prejudgment interest to
        the amount in controversy to be determined under N.C. Gen. Stat. § 6-21.6.
        Instead, the emphasis of the analysis is on the principal damage determinations.

39.     Upon information and belief, I am not aware of published caselaw which applies
        N.C. Gen. Stat. § 6-21.6 after post-verdict motions in a completely different
        forum than the trial court. Candidly, I do not believe I have had enough time to
        prepare an exhaustive hunt for all case law on this issue, but based on annotations

and the frequency of citations to Legacy, it does not appear that there is a published case on all-fours with Y-2 Yoga Cotswold, LLC's attempt to present this attorneys' fee issue to this Court—particularly after Y-2 Yoga Cotswold, LLC already presented post-trial, post-verdict motions to Judge Hoover.

40.   For the forgoing reasons, Y-2 Yoga Cotswold, LLC's claim for attorneys' fees should be barred as matter of law pursuant to waiver, collateral estoppel, or *res judicata*. Alternatively, Y-2 Yoga Cotswold, LLC's attorneys' fees should be limited to—at most-- $396,649.57, under N.C. Gen. Stat. § 6-21.6.

41.   In addition, for reference, in the event that this Court does make the findings required under N.C. Gen. Stat. § 6-21.6, I have included my firm's relevant hours and billing, as well as a similarly experienced attorney directly involved in this case as counsel for the subject project's architect.

42.   Upon information and belief, our firm's first billing entry appeared on March 16, 2017 from paralegal Monica Phillips.

43.   Upon information and belief, I entered our firm's last billing entry on March 20, 2019.

44.   Upon information and belief our firm was paid a total of $184,772.52 for our handling of the case, inclusive of all timekeepers and inclusive of $13,249.87 in expenses.

45.   I was first-chair counsel on the case, with my billed hours amounting to 1012.2 hours and all other timekeepers amounting to 195 hours, for a total of 1207.2 hours.

46.    Attorney John Barringer's rate on the file as a partner was $165.00 per hour and my rate as a senior associate, at the time, was $150.00 per hour.  Our paralegal rate was $90.00 per hour. Our rates were per an insurer's liability defense rate under a commercial general policy of insurance.

47.    Again, I am familiar with insurance liability rates and private litigation rates.  My highest private litigation rate at the time of this case in 2017 and 2018 was, upon information and belief, $225.00 per hour.

48.    Comparably, upon information and belief, Nancy Litwak, formerly with Hamilton Moon Stephens Steel & Martin, PLLC, and now with Rosenwood, Rose & Litwak, PLLC represented the architect in this case.  I have litigated with and against Ms. Litwak in construction cases since we started practice in 2012.

49.    Mr. Litwak's rate, through an error and omissions insurer for professional liability, for the defense of the architect, was, upon information and belief, $215 per hour.  Further, Ms. Litwak's standard private litigation rate at times pertinent to the development of this matter was $300 per hour.

50.    Upon information and belief, the above provides this Court with a snapshot of prevailing insurance rates between $150-$215 per hour, and a private rate as high as $300 per hour for an attorney in Mecklenburg County with roughly 5-6 years of experience in construction litigation as of the time of trial in 2018.

51.    For additional reference, upon information and belief, Plaintiff's demand at mediation, on or about July 18, 2018, was $1.5 million dollars with at least $350,000 paid in cash, and a consent judgment placing the Reid Defendants' properties in receivership, with a credit for any surplus to the Reid Defendants, but an excess judgment against the Reid Defendants for any shortage.

52.    In short, Plaintiff's principal verdict for the breach of contract exceeded only the cash portion of its last mediation demand by about $50,000.

53.    Upon information and belief, the Reid Defendants and Plaintiff never agreed on whether the Reid Defendants presented a concrete offer immediately following Mediation because Plaintiff believed that it did not have sufficient information to value the Reid Defendants' properties by relying solely on the public tax records or the publically available purchase price of the properties, and Plaintiff believed it was not clear whether any of the properties were subject to liens, encumbrances, mortgage payments or the like.

54.    Upon information and belief, Plaintiff's demand during trial was approximately $1.25 million, comprised of at least $400,000 in cash.   The Reid Defendants' offer consisted of variations of conditions on consent judgment, including but not limited to one written, and several verbal variations of a $600,000 claim to proceed in Bankruptcy Court, $50,000 paid in cash, exclusive from the $600,000, and consent to waive the pre-judgment attachment order.  Again, for candor to the court, I am not certain whether I have been able to exhaust each and every offer between the parties leading up to the jury's verdict, but the offer recited in this Paragraph was made on or about October 24, 2018.  Notwithstanding, the cash

portion of Plaintiff's demand exceeded the jury's verdict.  And, the parties were never able to reach an agreement concerning the various conditions concerning properties that may or may not be subject to sale, or the conditions concerning a consent judgment, if any.

55.     Upon information and belief, Judge Hoover repeatedly encouraged the parties to separately discuss settlement during recesses and in the evening hours throughout trial.  For this reason, as well as the many others stated above, Judge Hoover was in the most appropriate position to make the determination as to reasonable attorneys' fees, if any, and make the necessary findings for the award.

56.     Again, I have not been intimately involved in this case or acting as counsel of record since March 2019.  In the interest of candor with the Court, there may exist exhaustive briefing, exhibits, arguments, caselaw, or new testimony that I have not been able to review, witness or assess since my last involvement in the litigation between these parties.

57.     I humbly submit this Affidavit to the Court, and the parties, with great respect, and I hope that this Affidavit helps to inform all involved, regardless of the ultimate result.

FURTHER AFFIANT SAYETH NOT.

**[EXECUTION ON THE FOLLOWING PAGE]**

This the 16th day of November, 2020.

s/Christopher J. Campbell*
North Carolina Bar No: 44277
*Digital signature in light of COVID-19

## VERIFICATION (COVID-19)

I, Christopher Campbell, under the penalties for perjury, swear that the foregoing representation(s) in the forgoing Affidavit are true.

Christopher J. Campbell

# Exhibit "A"

STATE OF NORTH CAROLINA IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
COUNTY OF MECKLENBURG CASE NO. 16-CVS-23179

Y2 YOGA COTSWOLD, LLC,

     Plaintiff,

v.

VINROY W. REID; VR KING
CONSTRUCTION LLC; VR
INVESTMENTS, LLC; BARANKO
ENTERPRISE INC., and SPEND
MANAGEMENT SOLUTIONS, LLC,

     Defendants.

**FINAL JUDGMENT**

This case was tried by jury during the September 18, 2018 term of Superior

Court of Mecklenburg County.

On November 2, 2018, the jury returned its verdict on the issues submitted to

the jury as follows:

## A.   BREACH OF CONTRACT-REID DEFENDANTS

1.    "Did the Reid Defendants breach a construction contract with plaintiff
Y2 Yoga?"

    Yes

2.    "What amount of damages is the plaintiff entitled to recover from the
Reid Defendants for breach of a construction contract?"

    $168,021.00

3.    "What amount of special damages is the plaintiff entitled to recover
from the Reid Defendants for breach of a construction contract?"

    $228,628.57

## B.   FRAUD

4.   "Was the plaintiff damaged by the fraud of the Reid Defendants?"

No

5.   "What amount is the plaintiff entitled to recover from the Reid Defendants as damages for fraud?"

n/a

## C.   NEGLIGENT MISREPRESENTATION

6.   "Was the plaintiff financially damaged by a negligent misrepresentation of the Reid Defendants?"

No

7.   "What amount is the plaintiff entitled to recover from the Reid Defendants as damages for negligent misrepresentation?"

n/a

## D.   CONVERSION

8.   "Did the Reid Defendants convert the property of the plaintiff?"

No

9.   "What amount is the plaintiff entitled to recover from the Reid Defendants for the conversion of the plaintiff's project funds?"

n/a

## E.   PUNITIVE DAMAGES

10.   "Are the Reid Defendants liable to the plaintiff for punitive damages?"

No

11.   "What amount of punitive damages, if any, does the jury in its discretion award to the plaintiff against the Reid Defendants?"

n/a

2

### F.   UNFAIR OR DECEPTIVE TRADE PRACTICES

12.   "Did the Reid Defendants conceal receipt of, and use of, confidential bids from competing contractors?"

No

13.   "Did the Reid Defendants represent to the plaintiff a false bid for the project?"

No

14.   "Did the Reid Defendants represent to the plaintiff change orders with inaccurate and misleading information?"

No

15.   "Did the Reid Defendants conceal conflicts of interest with Spend Management Solutions?"

No

16.   "Did the Reid Defendants misappropriate project funds paid by Y2 Yoga?"

No

17.   "Did the Reid Defendants represent incorrect or incomplete project status information to the plaintiff?"

Yes

18.   "Did the Reid Defendants withhold requested project documents and records?"

No

19.   "Did the Reid Defendants fraudulently transfer real estate to conceal assets?"

No

3

20.     "Was the Reid Defendants' conduct in commerce or did it affect commerce?"

No

21.     "Was the Reid Defendants' conduct a proximate cause of the plaintiff's injury?"

n/a

22.     "In what amount has the plaintiff been injured by the Reid Defendants for unfair or deceptive trade practices which have proximately caused damage to Plaintiff?"

n/a

## G.     FRAUDULENT TRANSFER

23.     "Were the Reid Defendants' transfers of 1720 Pegram Street, 1413 Catherine Simmons, 626 Char Meck, 1228 Clanton Rd., 2586 Hemphill Street, and 9809 E. W.T. Harris Blvd. fraudulent transfers?"

No

## H.     BREACH OF CONTRACT-SPEND MANAGEMENT SOLUTIONS

24.     "Did the plaintiff and the defendant Spend Management Solutions enter into a contract under which Defendant Spend Management Solutions would provide construction management related services?"

No

25.     "Did Defendant Spend Management Solutions breach a contract for construction management services with the plaintiff?"

No

26.     "Was the defendant Spend Management Solutions' failure to perform a material term of the contract caused by the conduct of the plaintiff?"

Yes

4

27.    "What amount is the plaintiff entitled to recover from Spend Management Solutions for breach of the contract for construction management services?"

n/a

Prior to the return of the jury verdict, the Reid Defendants and Spend Management Solutions filed Motions for Directed Verdict. After a hearing, the Court entered an oral Order on the Directed Verdict Motions. The written Order on the Directed Verdict Motions is being entered contemporaneously with this Final Judgment.

Following the return of the jury verdict, Y2 Yoga filed a Motion for New Trial, a Motion for Judgment Notwithstanding the Verdict on Attachment Issues, and a Motion for Costs. After a hearing, the Court entered an Order on Post-Verdict Motions. The Order on Post- Verdict Motions is being entered contemporaneously with this Final Judgment.

Based on the foregoing,

IT IS THEREFORE ORDERED, based on the verdict of the jury that judgment is entered for Defendant Spend Management Solutions on Plaintiff Y2 Yoga's claim for breach of contract.

IT IS FURTHER ORDERED, based on the verdict of the jury, that judgment is entered for the Reid Defendants on Plaintiff Y2 Yoga's claims for fraud, negligent misrepresentations, conversion, fraudulent transfer, punitive damages, and unfair or deceptive trade practices.

IT IS FURTHER ORDERED, based on the verdict of the jury, that judgment is entered for Plaintiff Y2 Yoga against the Reid Defendants for breach of contract,

5

and damages in the amount of $396,649.57, with interest at the legal rate of 8%

from and after the date of breach, March 21, 2014, are awarded to Plaintiff Y2 Yoga.

IT IS FURTHER ORDERED that Plaintiff Y2 Yoga's costs of this action are

taxed to the Reid Defendants based on this judgment upon separate application by

Plaintiff Y2 Yoga. This judgment represents a complete and final disposition of all

claims and issues in this action.

Dated: ~~December~~, ~~2018~~. FEB  8 2019

The Honorable Judge Donnie Hoover
Superior Court Judge, Presiding

6

# Exhibit "B"

STATE OF NORTH CAROLINA      IN THE GENERAL COURT OF JUSTICE
                                  SUPERIOR COURT DIVISION

COUNTY OF MECKLENBURG    2019 FEB -8  P 4: 22   CASE NO. 16-CVS-23179

Y2 YOGA COTSWOLD, LLC,      MECKLENBURG COUNTY, C.S.C

       Plaintiff,                  BY

v.

VINROY W. REID; VR KING             **ORDER ON POST-VERDICT MOTIONS**
CONSTRUCTION LLC; VR
INVESTMENTS, LLC; BARANKO
ENTERPRISE INC., and SPEND
MANAGEMENT SOLUTIONS, LLC,

       Defendants.

Having considered Plaintiff Y2 Yoga Cotswold, LLC's Motion for New Trial,
Motion for Judgment Notwithstanding the Verdict on Attachment Dissolution
Issues, and Motion for Costs, on Friday, November 30, 2018, the Court rules as
follows:

Pursuant to Rule 59 of the North Carolina Rules of Civil Procedure, and in in
this Court's discretion, Plaintiff's Motion for New Trial is DENIED.

Pursuant to Rule 50 of the North Carolina Rules of Civil Procedure, and
viewing the evidence in a light most favorable to the Non-Movant Defendants, the
evidence of record, and the arguments of counsel, there is more than a scintilla of
evidence by which the jury could determine factual isssues related to Pre-Judgment
Attachment and Plaintiff's Motion for Judgment Notwithstanding the Verdict on
Attachment Issues is DENIED.

Nothing in this Order, however, is intended to or will be construed to affirm,
confirm, dissolve, dismiss, or set aside the Orders of Attachment entered in

connection with this action. Further, nothing in this Order is intended to restrict, bar, or limit the United States Bankruptcy Court for the Western District of North Carolina from affirming, confirming, dissolving, modifying, dismissing, or setting aside the Orders of Attachment in this matter.

The Motion for Costs is DENIED IN PART AND GRANTED IN PART. Y2 Yoga is awarded costs of $23,131.98, as follows:

| Description | Amount |
|---|---|
| Facilities fee | $16.00 |
| Initial filing and LAA fees | $180.00 |
| Certified mail service | $87.10 |
| Process fees | $120.00 |
| Other sheriff's fees | $165.00 |
| Hearing fees | $40.00 |
| Mediation costs | $262.50 |
| Deposition costs | $14,027.80 |
| Trial exhibits | $2,368.22 |
| **Expert witnesses** | |
| L. Steven Moore, P.E., RRC, REWC | |
| • Testimony time and related compensation and allowances | $3,491.86 |
| Nicholas R. Harris, CPA, CFA, CFE | |
| • Testimony time and related compensation and allowances | $2,373.50 |
| Total | $23,131.98 |

The Court finds the costs described above to be reasonable and necessary, and awards them as a matter of course and in its discretion, pursuant to N.C. Gen. Stat. §§ 6-1, 6-20, 7A-305, and 7A-314, and based on the stipulation of counsel for Plaintiff and the Defendants Vinroy W. Reid, VR King Construction LLC, VR

2

Investments LLC, and Baranko Enterprise, Inc. (together, the "Reid Defendants")
at the hearing on this matter.

The amount of these costs, $23,131.98, is to be taxed jointly and severally
against the Reid Defendants.

IT IS SO ORDERED.

Dated: ~~December ___, 2018.~~ FEB 8 2019

The Honorable Judge Donnie Hoover
Superior Court Judge, Presiding

3

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document was served upon all counsel of

record by facsimile and by depositing a copy of the same in an official depository of the U.S.

Mail in a postage-paid envelope addressed as follows:

> Facsimile: (404) 888-6199
> Gillian S. Crowl
> Swift Currie McGhee & Hiers LLP
> 1355 Peachtree Street NE, Suite 300
> Atlanta, Georgia 30309
> Attorney for Spend Management Solutions, LLC

> Facsimile: (704) 208-4645
> David G. Guidry
> Rabon Law Firm, PLLC
> 225 East Worthington Avenue, Suite 100
> Charlotte, North Carolina 28203
> Attorney for Y-2 Yoga Cotswold, LLC

This the 22nd day of February, 2019.

Christopher J. Campbell

CHRISTOPHER J. CAMPBELL

4

# Exhibit "C"

STATE OF NORTH CAROLINA      IN THE GENERAL COURT OF JUSTICE

SUPERIOR COURT DIVISION

COUNTY OF MECKLENBURG      14 CVS 23138

Y-2 YOGA COTSWOLD, LLC,

     Plaintiff,

vs.

VINROY W. REID, individually, VR
KING CONSTRUCTION, LLC, and VR
INVESTMENTS, LLC,

     Defendants.

**AMENDED COMPLAINT**



COMES NOW Plaintiff, by and through undersigned counsel, pursuant to Rule 15 of the
North Carolina Rules of Civil Procedure, and amends the complaint and avers as follows:

## PARTIES, JURISDICTION, AND VENUE

1.      Plaintiff, Y-2 Yoga Cotswold, LLC ("Y-2 Yoga"), is a North Carolina limited
liability company organized and existing under the laws of the State of North Carolina with its
principal place of business in Mecklenburg County, North Carolina.

2.      Defendant Vinroy Washington Reid ("Reid") is a resident of North Carolina
residing in Charlotte, Mecklenburg County, North Carolina.

3.      Defendant, VR King Construction, LLC ("King"), is a limited liability company
organized and existing under the laws of the State of North Carolina with its principal place of
business in Mecklenburg County, North Carolina. Upon information and belief, King is duly
licensed by the North Carolina Licensing Board for General Contractors to perform general
contracting work in North Carolina and holds license number 60597. Reid serves as registered
agent and managing member of King.

4.       Defendant, VR Investments, LLC ("VR Investments") is a limited liability company organized and existing under the laws of the State of North Carolina. Reid serves as registered agent and managing member of VR Investments.

5.       This court has jurisdiction over this dispute and venue is proper in Mecklenburg County, North Carolina.

6.       All conditions precedent to the bringing of this action have been performed, have occurred or have been waived.

7.       This action is brought within the applicable statute of repose.

## GENERAL ALLEGATIONS

8.       Y-2 Yoga offers yoga classes and other health and well-being services to Y-2 Yoga's members and to the general public.

9.       Y-2 Yoga leases retail space in the Cotswold Shopping Center, located at 280 S. Sharon Amity Road, Charlotte, Mecklenburg County, North Carolina 28211.

10.      Y-2 Yoga retained Spend Management Solutions, LLC ("SMS") to provide business consulting services to Y-2 Yoga, including consulting services concerning Y-2 Yoga's expansion plans.

11.      Y-2 Yoga acquired a leasehold interest in larger rental space adjoining Y-2 Yoga's existing location for the purpose of improving the space to include additional class rooms, a food bar, locker rooms, a spa, and other amenities (the "Project").

12.      Y-2 Yoga, having very limited knowledge of the construction industry, contracted with SMS for assistance with the selection of a contractor and other administrative and logistical services concerning the Project.

2

13.    With SMS' assistance and guidance, Y-2 Yoga obtained lump sum bids from three contractors for the Project. King submitted the lowest bid.

14.    Upon information and belief, in estimating the Project costs, King failed to obtain firm bids from one or more subcontractors and failed to conduct the necessary research, analysis, and due diligence necessary to properly estimate Project costs.

15.    Y-2 Yoga, as owner, entered into a lump sum construction contract (the "Contract") with King, as general contractor, whereby King promised to construct the Project in exchange for payment of $1,388,464.10. The stated Contract amount of $1,304,464.50 reflected credits due to Y-2 Yoga for up-front payments and amounts previously paid to King for demolition work.

16.    King and Y-2 Yoga incorporated into the Contact an agreed upon schedule of values which allocated the scope of work for the Project into its constituent tasks, and assigned each task a scheduled value which added up to the Contract sum of $1,388,464.10.

17.    King started work on the Project in or about August 2013.

18.    King submitted to Y-2 Yoga eight periodic payment applications on or about the following dates: September 5, 2013, September 27, 2013, October 28, 2013, November 25, 2013, January 16, 2014, February 25, 2014, March 19, 2014, and May 15, 2014.

19.    King submitted seven requests for change orders to Y-2 Yoga.

20.    Y-2 Yoga furnished SMS with copies of King's payment applications and requests for change order when received. SMS, in turn, reviewed the payment applications and requests for change order and advised Y-2 Yoga on how to proceed.

3

21.     In early 2014, Y-2 Yoga grew concerned about construction delays, the accuracy of King's payment applications and requests for change order, the ability of King to construct the Project, and the lack of adequate supervision of the work.

22.     Y-2 Yoga requested documentation from King to substantiate King's payment applications and requests for change order. King failed to provide the requested documentation and ultimately stopped performing work on the Project.

<strong>FIRST CLAIM FOR RELIEF</strong><br><strong>(Breach of Contract Against King)</strong>

23.     Plaintiff incorporates and alleges paragraphs 1 through 22 as though fully set forth herein.

24.     King materially breached the contract by, among other things, failing to furnish labor, materials, and equipment to the Project pursuant to the requirements of the Contract, failing to complete the Project in the required time, failing to provide supervision of the Project, failing to submit accurate payment applications, failing to pay subcontractors and suppliers, failing to coordinate subcontractors and suppliers, failing to comply with the building code, and ultimately abandoning the Project.

25.     As a result of King's material breaches of the Contract, Y-2 Yoga has suffered compensatory damages in excess of $1 million, including amounts paid by Y-2 Yoga to complete the Project and to repair or replace King's defective work.

26.     As a result of King's material breaches of the Contract, and King's failure to complete the Project in the time required, Y-2 Yoga has suffered loss of profits for the time the Project should have been completed but was not.

27.     Y-2 Yoga demands interest, costs, and attorneys' fees in accordance with the provisions of the Contract and applicable law.

4

## SECOND CLAIM FOR RELIEF
### (Common Law Fraud Against Reid and King)

28.     Y-2 Yoga incorporates and alleges paragraphs 1 through 22 as though fully set forth herein.

29.     Reid and King knew that the actual cost required to construct the Project would be higher than the Contract sum.

30.     Reid and King knew that funds required to pay subcontractors and suppliers would run out and the Project would fail unless King obtained from Y-2 Yoga funds greater than the Contract sum.

31.     Reid and King, being previously acquainted with SMS personnel, knew that SMS was not qualified to administer a construction project of this type.

32.     Reid and King knew that SMS lacked the skill and experience required to properly and competently advise Y-2 Yoga on payment applications, contract administration, workmanship, scheduling, materials selection, and other aspects of a commercial construction project.

33.     Reid and King knew that Y-2 Yoga's representative taught yoga and fitness classes for Y-2 Yoga and lacked experience in commercial construction projects.

34.     Reid and King knowingly submitted inaccurate payment applications and unjustified requests for change order to Y-2 Yoga as a means to procure from Y-2 Yoga funds greater than the Contract sum.

35.     Reid and King intentionally billed Y-2 Yoga twice for the same work by changing the description. For example, Reid and King billed Y-2 Yoga for "soil exploration" in the first payment application and later as a change order for "move plumbing for footings." Similarly, Reid and King billed Y-2 Yoga for "refill and compact, with stone" in the first payment

5

application and later in the fourth payment application as a change order for "refill footing with washed stone, dowel into existing footing, reroute or cut pipe."

36.    Reid and King intentionally misrepresented the value and completion percentage of work and materials "completed and stored to date" in every payment application submitted to Y-2 Yoga.

37.    To conceal the inaccuracies of the payment applications, Reid and King employed sleight of hand maneuvers such as installing over areas before rough in work or wiring had been installed between the wall studs.

38.    Reid and King intentionally omitted or decreased the value of work from previously submitted payment applications to artificially inflate the scheduled value for certain items. For example, the scheduled value for "HVAC – Subcontract" throughout all payment applications was $240,000.00. By the fourth payment application, after employing their deceptive billing practices, Reid and King billed and were paid $585,041.20 for "HVAC – Subcontract."

39.    Using the methods described above, Reid and King fraudulently billed Y-2 Yoga for, among other scheduled items: superintendent; plan printing, building permitting, signage allowance, millwork materials, storefront materials, roof leader allowance, tool rental, demolition, concrete, masonry, carpentry materials, door material and labor, paint, restroom accessories, plumbing, electrical, fire alarm, interior walls, acoustical ceiling materials, flooring materials, shower and cold room tile, vertical platform, heating, ventilation and air conditioning, fire sprinklers, electrical, soil investigation, refilling and compaction of soil, and dumpster containers.

40.     As the Project progressed, Reid and King inserted items into the schedule of values without requesting a change order. For example, in the seventh payment application, Reid and King billed Y-2 Yoga $10,000.00 for "profit and overhead." The unilaterally inserted items exceed $45,000.00.

41.     Over the course of the Project, Reid and King submitted eight payment applications totaling $3,316,630.77.

42.     The sum of the amount requested in the eight payment applications submitted to Y-2 Yoga exceeds the original Contract sum by $1,950,725.77.

43.     The sum of the amount requested in the eight payment applications submitted to Y-2 Yoga exceeds the Contract sum, as adjusted by change orders one through six, by $1,805,550.57.

44.     The sum of the amount requested in the eight payment applications submitted to Y-2 Yoga exceeds the original Contract sum plus approved and rejected change orders by $1,682,320.57.

45.     To camouflage their manipulations of the scheduled values, and to minimize the appearance of an increase in the purported Contract sum, Reid and King deleted from the eighth payment application scheduled values for plan printing, roofing upgrades, storefront installation, operable partition, acoustical ceiling, flooring, wall painting, restroom accessories, soil exploration, and refilling and compacting with stone. Based upon these manipulations alone, and without regard to the other fraudulent acts committed by Reid and King, Y-2 Yoga suffered damages of $741,768.30.

46.     In the spring of 2014, Y-2 Yoga and SMS made repeated requests to Reid and King for documentation demonstrating that the Project funds paid to King were actually spent on

7

the Project. Reid and King failed and refused to provide the requested documentation. Instead, Reid and King submitted the eighth payment application to Y-2 Yoga requesting payment of an additional $611,419.74.

47.    The concealments and misrepresentations of Reid and King were reasonably calculated to deceive Y-2 Yoga.

48.    The concealments and misrepresentations were done with intent to deceive and with the intent that Y-2 Yoga act upon the concealments and misrepresentations.

49.    Y-2 Yoga reasonably relied upon and was in fact deceived by the concealments and misrepresentations of Reid and King.

50.    Y-2 Yoga suffered principal damages in excess of $25,000.00 proximately caused by Reid's and King's concealments and misrepresentations.

51.    Reid and King participated in the fraud and the fraud was related to the above-stated compensatory damages.

52.    Y-2 Yoga is entitled to recover punitive damages from Reid and King pursuant to section 1D-5 of the North Carolina General Statutes.

### THIRD CLAIM FOR RELIEF
### (Alternative Claim for Negligent Misrepresentation Against Reid and King)

53.    Y-2 Yoga incorporates paragraphs 1 through 22 of this Complaint and those portions of paragraphs 35 through 45 describing misrepresentations in payment applications as though fully set forth herein.

54.    In the alternative to the preceding claim against Reid and King for common law fraud, Y-2 Yoga asserts a claim against Reid and King for negligent misrepresentation.

55.    Reid and King knew and intended for Y-2 Yoga to rely upon the representations contained in the payment applications.

8

56.    Reid and King were obligated to exercise due care with respect to representations contained in the payment applications.

57.    Reid and King failed to exercise reasonable care and competence in preparing the payment applications.

58.    Y-2 Yoga justifiably relied upon the representations of Reid and King and, in reliance on thereon, made payments for work not earned.

59.    Y-2 Yoga's justifiable reliance upon Reid's and King's misrepresentations caused Y-2 Yoga to incur financial damage.

60.    In the spring of 2014, Y-2 Yoga and SMS made repeated requests to Reid for documentation demonstrating that the Project funds paid to King were spent on the Project. Reid and King failed to provide the requested documentation.

61.    By reason of the foregoing, Y-2 Yoga had been damaged in an amount in excess of $25,000.00, plus interest, attorneys' fees, and costs.

## FOURTH CLAIM FOR RELIEF
### (Violation of N.C. Gen. Stat. § 75-1.1 *et seq.* Against Reid and King)

62.    Y-2 Yoga incorporates paragraphs 1 through 51 of this Complaint as though fully set forth herein.

63.    Reid and King engaged in unfair or deceptive acts or practices in violation of section 75-1.1 *et seq.* of the North Carolina General Statutes with respect to Y-2 Yoga, including:

        a.    Obtaining property by false pretenses in violation of section 14-100 of the North Carolina General Statutes;

        b.    Committing common law fraud; *and*

        c.    Engaging in trickery, artifice, and deceit for pecuniary gain.

9

64.     Reid's and King's acts were in or affected commerce.

65.     As a result of Reid's and King's unfair and deceptive trade practices, Y-2 Yoga
has suffered damages in the principal amount in excess of $25,000.00.

66.     Y-2 Yoga requests that damages suffered by Y-2 Yoga as a result of Reid's and
King's unfair or deceptive trade practices be trebled as required by section 75-16 of the North
Carolina General Statutes.

67.     Y-2 Yoga requests an award of attorneys' fees as permitted by section 75-16.1 of
the North Carolina General Statutes.

## FIFTH CLAIM FOR RELIEF
### (Piercing the Corporate Veil Against All Defendants)

68.     Y-2 Yoga incorporates paragraphs 1 through 67 of this Complaint as though fully
set forth herein.

69.     Reid exercises complete domination and control over the finances, policies, and
business practices of King and VR Investments (collectively the "LLC Defendants") to such a
degree that the LLC Defendants operate merely as an alter ego of Reid.

70.     Reid serves as managing member of King.

71.     Reid serves as managing member of VR Investments.

72.     Dealings among the LLC Defendants are not arms-length transactions, but rather
entered for the purposes of concealing assets and defrauding creditors. For example, King
conveyed parcel number 081-166-94 to VR Investments without payment or other consideration.

73.     The LLC Defendants operate with no independent will, and are financially
dependent on Reid.

74.     Based upon Y-2 Yoga's most recent assessment, Reid and King misappropriated approximately $900,000.00 to $1 million from Y-2 Yoga. Reid and King refuse to account for the Project funds paid by Y-2 Yoga.

75.     Upon information and belief, and based upon Reid's representations in early 2014 that King had insufficient funds to complete the Project or pay amounts due to subcontractors or suppliers, Reid directed Project funds paid by Y-2 Yoga to King out of King and toward Reid's other businesses or personal pursuits.

76.     The aforesaid acts justify piercing the corporate veil and holding all Reid and the LLC Defendants liable for the damages suffered by Y-2 Yoga.

**WHEREFORE**, Y-2 Yoga prays as follows:

A.      That the Court exercise its equitable power to pierce the corporate veils such that Reid and both LLC Defendants be jointly and severally liable for all damages awarded to Y-2 Yoga, whether statutory, in contract, in tort, or any combination thereof;

B.      That judgment be entered in favor of Y-2 Yoga and against Defendants for compensatory damages in an amount to be proved at trial;

C.      That Y-2 Yoga be awarded punitive damages against Reid and the LLC Defendants pursuant to section 1D-5 of the North Carolina General Statutes on Y-2 Yoga's common law fraud claim;

D.      That Y-2 Yoga be awarded treble damages against Reid and the LLC Defendants pursuant to section 75-16 of the North Carolina General Statutes;

E.      That Y-2 Yoga be awarded attorneys' fees pursuant to section 75-16.1 of the North Carolina General Statutes;

11

F.    That Y-2 Yoga be allowed to elect its remedies upon the reading of the verdict;

G.    For an award of interest and costs;

H.    For a trial by jury on all issues so triable; *and*

I.    For such other and further relief as this Court may deem just and proper.

**DATED** this ___27th___ day of January, 2015.


                    HORACK, TALLEY, PHARR & LOWNDES, P.A.


                    By: _____
                    Gregory E. Shelton
                    2600 One Wells Fargo Center
                    301 S. College Street
                    Charlotte, NC  28202
                    (704) 377-2500 (telephone)
                    (704) 372-2619 (facsimile)
                    gshelton@horacktalley.com

                    ATTORNEYS FOR PLAINTIFF

12

## CERTIFICATE OF SERVICE

Pursuant to Rule 5(b) of Section 1A-1 of the North Carolina General Statutes, I certify that on this date, I served a copy of the foregoing and attached Amended Complaint on the defendant Vinroy W. Reid, by depositing a copy thereof, enclosed in a pre-paid envelope, in an official depository under the exclusive care and custody of the United States Postal Service, properly addressed as follows:

> Vinroy W. Reid
> 7407 Boswell Road
> Charlotte, NC  28215
> *(Defendant)*
>
> Fenton T. Erwin, Jr., Esq.
> Erwin, Bishop, Capitano & Moss, P.A.
> 4521 Sharon Road
> Suite 350
> Charlotte, NC 28211

**DATED** this 27th day of January, 2015.

HORACK, TALLEY, PHARR & LOWNDES, P.A.

By:

Gregory L. Shelton
2600 One Wells Fargo Center
301 S. College Street
Charlotte, NC  28202
(704) 377-2500 (telephone)
(704) 714-7935 (facsimile)
gshelton@horacktalley.com

ATTORNEYS FOR PLAINTIFF

13

# Exhibit "D"

FILED

STATE OF NORTH CAROLINA       IN THE GENERAL COURT OF JUSTICE
2018 MAR -6 P 3: 52 SUPERIOR COURT DIVISION
COUNTY OF MECKLENBURG       NO. 16-CVS-23179

MECKLENBURG CO., C.S.C.

Y2 YOGA COTSWOLD, LLC,
BY

Plaintiff,

v.

VINROY W. REID;
VR KING CONSTRUCTION LLC;
VR INVESTMENTS, LLC;
BARANKO ENTERPRISE INC., and
SPEND MANAGEMENT
SOLUTIONS, LLC,

Defendants.

**SECOND AMENDED VERIFIED
COMPLAINT**

Plaintiff Y2 Yoga Cotswold, LLC amends its Complaint under Rule 15 and
states as follows:

## PARTIES, JURISDICTION, AND VENUE

1.     Plaintiff Y2 Yoga Cotswold, LLC is a North Carolina limited liability
company doing business in Charlotte, Mecklenburg County, North Carolina.

2.     Defendant Vinroy Washington Reid is a resident and citizen of
Charlotte, Mecklenburg County, North Carolina.

3.     Defendant VR King Construction LLC is a North Carolina limited
liability company with its principal office located at 9809 E. W.T. Harris Boulevard,
Charlotte, Mecklenburg County, North Carolina 28227. Mr. Reid is the registered
agent and sole managing member of VR King Construction. VR King Construction
holds an unlimited general contractor license, number 60597, issued by the North
Carolina Licensing Board for General Contractors.

4.     Defendant VR Investments, LLC is a North Carolina limited liability company created by Mr. Reid in March 2014 with its principal office located at 9809 E. W.T. Harris Boulevard, Charlotte, Mecklenburg County, North Carolina 28227. Mr. Reid is the registered agent and sole managing member of VR Investments.

5.     Defendant Baranko Enterprise Inc. is a North Carolina corporation with its principal office located at 9809 E. W.T. Harris Boulevard, Charlotte, Mecklenburg County, North Carolina 28227. Baranko Enterprise is solely owned and controlled by Mr. Reid.

6.     Defendant Spend Management Solutions, LLC is a North Carolina limited liability company with its principal office located at 212 S. Tryon Street, #1510, Charlotte, Mecklenburg County, North Carolina 28281.

7.     The Court has jurisdiction over this dispute and venue is proper in Mecklenburg County, North Carolina.

## GENERAL ALLEGATIONS

8.     Y2 Yoga offers yoga classes and other health and well-being services, clothing, food and beverages, and other goods and services to its members and to the general public.

9.     At all relevant times, Y2 Yoga has operated its business in Cotswold Shopping Center, located at 280 S. Sharon Amity Road, Charlotte, Mecklenburg County, North Carolina, 28211.

10.    In the summer of 2012, in response to increased demand for its services, Y2 Yoga began developing and executing a strategic plan to expand its business. As

2

part of its plan, Y2 Yoga began evaluating the option of relocating to a retail space within Cotswold Shopping Center adjacent to and larger than the space it occupied at that time. The larger space would allow Y2 Yoga to have additional and larger yoga studios, to offer more classes with larger class sizes, to accommodate more members and customers, and to increase and expand its health and well-being service offerings, retail goods offerings, and food and beverage sales.

11.     To assist Y2 Yoga with its strategic expansion plans, Y2 Yoga engaged Spend Management Solutions to provide it with construction project management, business operations management, financial advice, and consulting services, in exchange for a monthly fee.

12.     By late November 2012, Y2 Yoga had acquired a leasehold interest in a larger retail space in Cotswold Shopping Center for the purpose of improving and renovating the space to accommodate yoga exercise rooms, a food bar, locker rooms, a spa, and other amenities (the "Project").

13.     Y2 Yoga relied on Spend Management Solutions' knowledge and advice for assistance and services related to the Project, including but not limited to, the selection and management of a general contractor, space planning, communication and coordination with the architect, scheduling, cost control and analysis, quality control, as well as other construction project management services for the Project.

14.     Spend Management Solutions held itself out to Y2 Yoga as being capable, qualified, and able to competently provide these and all other services it offered and attempted to provide. As Y2 Yoga's construction project manager,

3

consultant, and advisor, Spend Management Solutions gained and held a position of trust and confidence with Y2 Yoga. Spend Management Solutions' knew and understood that it was acting in this trusted, fiduciary capacity for Y2 Yoga, and through its words and conduct in regards to Y2 Yoga and others involved with the Project accepted and acknowledged this role and responsibility.

15.    In mid-January 2013, after three general contractors had been selected to bid on the Project, Spend Management Solutions' consultant Walter H. Rasby, III, notified Y2 Yoga that Spend Management Solutions would be adding a fourth general contractor, VR King Construction, as a bidder on the Project. VR King Construction was the only general contractor that Spend Management Solutions proposed as a bidder. Neither Mr. Rasby nor anyone else with Spend Management Solutions disclosed the existence and extent of Mr. Rasby's and Spend Management Solutions' relationship with Mr. Reid, who owns and controls VR King Construction.

16.    With VR King Construction added to the final list of bidders, Spend Management Solutions proceeded to "lead the process" for evaluating the qualifications and bids of the general contractors and selecting a general contractor for the Project. Among other things, Spend Management Solutions prepared the "RFP package," communicated and coordinated with the architect on drawings and changes to drawings, analyzed and evaluated the bids, and advised Y2 Yoga on selecting a general contractor based on "price, ability to meet the schedule, and the team's confidence in [the general contractor's] capabilities."

17.     Relying on Spend Management Solutions' leadership and guidance, Y2 Yoga obtained lump sum bids for the Project from four general contractors. By providing a lump sum bid, each general contractor offered to complete the Project for the total amount stated, inclusive of all fees, overhead, and potential profit for the general contractor. In doing so, the general contractor accepted the risk of properly and accurately understanding the Project drawings, all of its requirements, and associated costs, and, for aspects of the Project to be performed by subcontractors, obtaining firm, reliable bids from subcontractors to support its bid, and offered to complete the Project for the amount stated. After the general contractor's lump sum bid is accepted and agreed to, the general contractor may not unilaterally increase the contract amount or pass cost increases on to the owner without the owner's consent. Doing so requires a written, signed amendment to the contract, known in the construction industry as a "change order," which also explains the additional work and its associated costs.

18.     In making a bid for the Project, Mr. Reid and VR King Construction failed to adequately review or understand the Project requirements and architectural drawings, failed to obtain firm bids from subcontractors and suppliers, and failed to conduct the research, analysis, and due diligence necessary to properly bid on the Project. In addition, Mr. Reid and VR King Construction used and included amounts in the bid that were less than the actual amounts provided to Mr. Reid and VR King Construction by subcontractors and suppliers.

19.     Aiding and abetting Mr. Reid and VR King Construction's conduct, Spend Management Solutions secretly provided competitive bidding information from other bidders to Mr. Reid and VR King Construction. Spend Management Solutions intentionally and knowingly provided this bidding information to Mr. Reid and VR King Construction without Y2 Yoga's knowledge and did so to give Mr. Reid and VR King Construction an unfair advantage in the bidding process and enable him to provide a bid without the due diligence that otherwise would be necessary.

20.     Mr. Reid and VR King Construction used the secret bidding information improperly provided to them by Spend Management Solutions to bid on the Project.

21.     In mid-February 2013, on the advice and recommendation of Spend Management Solutions, VR King Construction was selected to be the general contractor for the Project.

22.     Shortly after VR King Construction was selected, one of the other bidders questioned the selection of VR King Construction. Mr. Rasby responded by telling Y2 Yoga that Spend Management Solutions had "full confidence in VR King's ability to do a great job in the manner and approach that is a good fit for this project and you." Mr. Rasby also added, "[l]et's start swinging hammers and see if [VR King Construction's] nails go in straight just like [the other bidder's] would."

23.     Contrary to its assurances to Y2 Yoga, Spend Management Solutions lacked the competency to adequately evaluate Mr. Reid or VR King Construction's capabilities or the needs of the Project and utterly failed to do so. Spend Management

6

Solutions had no reasonable basis for having "full confidence" in Mr. Reid or VR King Construction or telling Y2 Yoga that it did.

24.     Mr. Reid and VR King Construction knew that Spend Management Solutions was not qualified to administer a construction project and serve as a construction project manager and took unfair advantage of that fact at Y2 Yoga's expense.

25.     Mr. Reid and VR King Construction knew that Spend Management Solutions lacked the skill and experience required to properly and competently advise Y2 Yoga on payment applications, contract administration, workmanship, scheduling, materials selection, and other aspects of the Project.

26.     Relying on Spend Management Solutions' faulty assurances and VR King's misrepresentations, in late February 2013, Y2 Yoga entered into an agreement with VR King Construction for demolition and other preliminary work related to the Project (the "Demolition Agreement").

27.     Spend Management Solutions drafted the Demolition Agreement.

28.     Under the terms of the Demolition Agreement, VR King Construction agreed to complete the demolition and other preliminary work on the Project within two weeks at a cost of $84,000. As Y2 Yoga's construction project manager, Spend Management Solutions included a provision in the Demolition Agreement requiring that Mr. Rasby receive all notices of "schedule or cost impact."

29.     Around this time, VR King Construction engaged its own construction project manager for the Project, Hakeem Bailey with AeroRaq Engineering Inc.

7

30.    VR King Construction performed demolition and other preliminary work during the spring of 2013.

31.    In April 2013, VR King Construction originated and issued two change orders, supposedly for unforeseeable, additional work. In summary, these change orders stated as follows:

| Number | Date | Description | Added time | Added cost |
|---|---|---|---|---|
| 1 | April 3, 2013 | Excavate, Identify, cut and cap underground plumbing in the way of support footings | 3 days | $3,326.40 |
| 2 | April 9, 2013 | Refill footing with washed stone, dowel into existing footing, reroute or cut pipe | 10 days | $17,352.20 |
| Totals | | | 13 days | $20,678.60 |

32.    Spend Management Solutions received the change orders and evaluated them.

33.    Y2 Yoga reasonably relied on Spend Management Solutions in deciding whether to approve the change orders and reasonably expected Spend Management Solutions to notify Y2 Yoga if a change order should not be approved. Spend Management Solutions did not do so.

34.    By the end of May 2013, Y2 Yoga had paid VR King Construction $124,000. This amount covered the $84,000 of demolition and other preliminary under the Demolition Agreement, plus, a $40,000 credit by VR King Construction toward the full cost of the Project.

35.    During the summer, Y2 Yoga worked to secure financing for the full cost of the Project. In connection with its efforts, Y2 Yoga requested that VR King Construction provide detailed schedules, construction plan, timelines, and cost information for completion of the Project and relied on Spend Management Solutions to evaluate this information. VR King Construction and Spend Management Solutions knew that Y2 Yoga was attempting to obtain financing and that information provided to Y2 Yoga would be used for this purpose.

36.    In response to Y2 Yoga's requests, VR King Construction negligently or knowingly provided false information, intending Y2 Yoga to rely on this information, and Y2 Yoga did in fact rely on it. Spend Management Solutions failed to adequately review and evaluate the information provided by VR King Construction.

37.    In August 2013, again relying on Spend Management Solutions' false assurances and VR King Construction's misrepresentations, Y2 Yoga entered into a lump sum construction agreement with VR King Construction (the "Construction Agreement").

38.    Spend Management Solutions drafted the Construction Agreement, which incorporated the schedule, construction plan, timelines and cost information that had been provided by VR King Construction.

39.    Under the terms of the Construction Agreement, VR King Construction promised to complete the Project by November 28, 2013, in exchange for additional payments totaling $1,304,464.50, which, when added to the $84,000 under the Demolition Agreement resulted in a total Project cost of $1,388,464.50. The

Construction Agreement also restated the $40,000 credit that VR King Construction carried in favor of Y2 Yoga toward the total Project cost.

40.     The total Project cost of $1,388,464.50 was also reflected in the Schedule of Values prepared by VR King Construction and presented to Y2 Yoga at the outset of the Project. The Schedule of Values allocated the total agreed-upon scope of work for the Project into its constituent tasks (e.g, Demolition, Carpentry, Electrical, HVAC) and assigned each task a "scheduled value" corresponding to the agreed-upon cost for that task, all of which added up to the total Project amount of $1,388,464.50.

41.     Mr. Reid and VR King Construction knew and intended that Y2 Yoga rely on the Schedule of Values to assess and understand the actual progress of the Project. In addition, no changes to an existing task's "scheduled value" should be made, nor should a new task with a corresponding "scheduled value" be added to the Schedule of Values without a legitimate, approved "change order."

42.     Under the terms of the Construction Agreement, VR King Construction agreed to perform its work in a "timely and professional manner," that it had or will have the "resources, capacity, expertise, and know-how" to complete the Project, that "time is of the essence" to complete the Project by the agreed-upon deadline of November 28, 2013, and that VR King Construction would be liable to Y2 Yoga for costs and losses from a delay in finishing the Project on time.

43.     In addition, under the terms of the Construction Agreement, VR King Construction promised to have $2,000,000 of general liability insurance, with Y2 Yoga named as an additional insured on the insurance policy.

44.     In addition, in the Construction Agreement, VR King Construction represented that it was bonded in the amount of $1,304,464.50.

45.     As Y2 Yoga's construction project manager, Spend Management Solutions included a provision in the Construction Agreement requiring that Mr. Rasby receive all notices of "schedule or cost impact."

46.     Mr. Bailey was listed as VR King Construction's construction project manager.

47.     Over the next several months, at various times and based on invoices from VR King Construction, Y2 Yoga made payments to VR King Construction for the Project. Based on the Construction Agreement and Schedule of Values, the parties agreed and understood that the funds provided by Y2 Yoga were to be used by VR King Construction to pay subcontractors and suppliers and for specified work and materials for the Project for the benefit of Y2 Yoga.

48.     Over the course of the Project, Mr. Reid and VR King Construction repeatedly attempted to increase the costs of the Project over the agreed-upon amount in an effort to conceal the negligent or fraudulent bid and lack of due diligence, by issuing "change orders." In addition, Mr. Reid and VR King Construction also issued change orders with inaccurate or misleading information intended to deceive Y2 Yoga and trick it into approving Mr. Reid and VR King Construction's defective and substandard work.

49.     In October 2013, VR King Construction originated and issued three change orders to Y2 Yoga, supposedly for unforeseeable, additional work. In summary, these change orders stated as follows:

| Number | Date | Description | Added time | Added cost |
|--------|------|-------------|-----------|-----------|
| 3 | October 7, 2013 | Materials cost Increases due to Project delays | 0 days | $12,541.20 |
| 4 | October 7, 2013 | Level and pour first floor concrete | 4 days | $17,352.20 |
| 5 | October 30, 2013 | Steel Corrections | 4 days | $13,142.80 |
| Totals | | | 8 days | $43,036.20 |

50.     Spend Management Solutions received the change orders and evaluated them.

51.     Y2 Yoga reasonably relied on Spend Management Solutions in deciding whether to approve the change orders and reasonably expected Spend Management Solutions to notify Y2 Yoga if the change orders should not be approved. Spend Management Solutions did not do so.

52.     In early November 2013, VR King Construction's construction project manager, Mr. Bailey, abruptly resigned from the Project.

53.     On November 4, 2013, Mr. Reid told Y2 Yoga via email to "exclude" Mr. Bailey from any further communications about the Project, but Mr. Reid did not provide any other explanation for Mr. Bailey's departure.

54.     At about the same time, Mr. Bailey informed Y2 Yoga via email that he and his company, AeroRaq Engineering, were "no longer retained" by VR King

Construction to serve as construction project manager for the Project. Like Mr. Reid, Mr. Bailey also did not give Y2 Yoga any additional explanation.

55.     According to Mr. Bailey's termination letter, however—which Y2 Yoga has since learned of—Mr. Bailey resigned from the Project because of VR King Construction's "subversive practices and management of contracts" and the "contractual dishonoring and inconsistency" of VR King Construction's practices on the Project.

56.     More particularly, on information and belief, Mr. Bailey resigned from the Project because, as VR King Construction's construction project manager, he discovered, among other things, that VR King Construction failed to accurately assess and present the Project costs and schedule to Y2 Yoga, was not following industry standard practices, was not competently performing the work on the Project, was not performing required work, was performing substandard, deficient, and defective work, was not adequately supervising the work on the Project, was mismanaging or misappropriating Project funds and did not have the resources to complete the Project, and was negligently or intentionally presenting false information to Y2 Yoga to induce Y2 Yoga to approve contract amendments through illegitimate change orders and to pay additional amounts on the Project that Y2 Yoga should not have to pay.

57.     Not long after Mr. Bailey resigned from the Project, VR King Construction originated and issued to Y2 Yoga a sixth change order, supposedly for unforeseeable, additional work. In summary, this change order stated as follows:

13

| Number | Date | Description | Added time | Added cost |
|---|---|---|---|---|
| 6 | November 25, 2013 | Extend Floor to create landing for new stairs | 3 weeks | $60,346.70 |

58.    Spend Management Solutions received the change order and evaluated

it.

59.    Y2 Yoga reasonably relied on Spend Management Solutions in deciding

whether to approve the change order and reasonably expected Spend Management

Solutions to notify Y2 Yoga if the change order should not be approved. Spend

Management Solutions did not do so.

60.    By mid-January 2014, Y2 Yoga had paid VR King Construction

$1,433,915.50, the Project completion deadline had passed (even after including the

additional time from prior change orders), and although Y2 Yoga was being led to

believe the Project was almost finished, it was actually nowhere near complete.

61.    On January 15, 2014, VR King Construction issued Y2 Yoga a seventh

change order summarized as follows:

| Number | Date | Description | Added time | Added cost |
|---|---|---|---|---|
| 7 | January 15, 2014 | [None provided] | 6 weeks | $123,230.00 |

62.    The seventh change order did not describe or list any actual work or

changes that were requested or necessary. Instead, it simply listed broad categories

with round numbers, such as "Electrical $29,400.00," "HVAC $35,000.00," and

"Equipment $12,000.00."

63.    The items listed in the seventh change order were not legitimate and did

not describe unforeseeable or additional, required work, or any actual work at all. Mr.

14

Reid and VR King Construction had no proper purpose for creating and issuing the seventh change order and intended it to fraudulently induce Y2 Yoga into paying more money to supposedly complete the Project or to improperly use it as a pretext for abandoning the Project, if Y2 Yoga refused to approve it.

64.     After receiving VR King's seventh change order—which would have added more cost and time to the Project than the prior six change orders combined—Y2 Yoga challenged Mr. Reid and VR King Construction about the Project, its drastically and unexpectedly rising costs, the continued construction delays, the accuracy of Mr. Reid and VR King Construction's representations about progress, costs, and change orders. Y2 Yoga also began questioning Spend Management Solutions about its failure to identify any of these issues or otherwise fulfill its obligations as Y2 Yoga's advisor and construction project manager.

65.     Over the next several weeks, Y2 Yoga attempted to have VR King Construction continue working and complete the Project, but VR King Construction failed and refused to do so.

66.     In addition, Y2 Yoga requested information and documentation from VR King Construction to substantiate the value of work performed, the legitimacy of change orders, and accuracy of scheduling information. Y2 Yoga also pressed Spend Management Solutions for answers about its failure to analyze the information or lack of information submitted by Mr. Reid during the course of the Project, understand or communicate the real status and problems of the Project, and adequately fulfill its role as construction project manager.

15

67.    In response, VR King Construction did not provide the requested information and documentation, claimed he did not have the funds or resources to complete the Project, could not account for his use of funds received on the Project, refused to provide cost and scheduling information to fully complete the Project, and instead, offered illegitimate excuses for cost increases and delays, and repeatedly refused to proceed with work unless Y2 Yoga approved the bogus, seventh "change order."

68.    In March and again in May, 2015, VR King Construction sent Y2 Yoga two different Schedules of Values, each purporting to show the actual costs and work needed to complete the Project. Each one contained different amounts and Project status information, despite the fact that little, if any, work had been done in the interim. Neither of them accurately represented the agreed-upon values or the true status of the Project. Mr. Reid and VR King Construction had no proper purpose for providing these Schedules of Values and provided them to conceal problems and misconduct and delay Y2 Yoga's discovery of these problems and misconduct.

69.    Meanwhile, Spend Management Solutions began claiming that it was "not a construction mgmt company" after all, despite months of contrary statements and action, and claimed that it would "have to return to [its] Business Ops activity in prep for transitioning to the new space." Nevertheless, Spend Management Solutions continued to provide Y2 Yoga with uninformed and flawed advice about the construction work involved in the Project even though it was unable to competently and adequately analyze these issues.

16

70.    After it became clear to Mr. Reid and VR King Construction that Y2 Yoga would never approve the seventh "change order," Mr. Reid and VR King Construction abandoned the Project.

71.    As a result of VR King Construction's failure or refusal to continue to work on the Project, and, in an effort to mitigate damages, protect its business and substantial investment in the Project, Y2 Yoga took a number of steps, including working with or engaging subcontractors and suppliers itself, and hiring a replacement general contractor to finish the Project.

72.    In the course of completing the Project with the replacement general contractor, countless defects, deficiencies, and significant problems with the work performed by VR King Construction were discovered and documented. For example, the architect, with input from the replacement general contractor and an engineering firm, provided Y2 Yoga with an Observation Report describing hundreds of "deviations from the contract documents and or workmanship issues which are readily apparent" with respect to nearly every aspect of the Project.

73.    One of the many examples of shoddy work by VR King Construction was with the flooring. Instead of properly installing the correct flooring, VR King Construction applied a layer of floor topping material up to four inches thick in certain places. The topping material improperly installed by VR King Construction was too thick, did not adhere to the flooring material underneath it, and was uneven, cracking, structurally unsound, and left the entire space out of compliance with disability access requirements, among many other problems. Worse, not only did the

defective flooring installed by VR King Construction require replacement, it also necessitated the repair, replacement, and reworking of many other aspects of the Project, including walls, doors, stairs, and an elevator that were all improperly constructed on top of the defective floor.

74.    Additional defects and deficiencies with the work done by VR King Construction that were not readily apparent or had been concealed, were later discovered. Some examples include:

- Failing to install roof expansion joints, requiring replacement;

- Installing an HVAC system backwards on the roof, requiring a crane crew to correctly install it; and

- Defectively constructing multiple areas of the studio, including a downstairs cove area that was unable to accommodate lighting, an upstairs spa hallway that had to be repaired, and a restaurant area wall that swayed like a curtain and was unable to support tile;

75.    In addition, it was discovered that VR King Construction failed to pay a number of subcontractors and suppliers or paid less than required to adequately secure materials needed for the Project. As construction project manager, Spend Management Solutions was tasked with confirming that materials were adequately secured with deposits, but failed to competently perform these duties.

76.    Y2 Yoga paid the replacement general contractor over $1.7 million to repair and replace Mr. Reid's work and complete the Project to its original required, planned specifications. All of the work performed by the replacement general contractor was necessary to repair or replace the poor, substandard, deficient, and defective work and related damage done by VR King Construction and to properly

complete the Project. The amounts paid by Y2 Yoga to the replacement general contractor were in addition to the over $1.4 million Y2 Yoga had already paid to VR King Construction.

77.     The Project was completed by March 2015—a delay of fifteen months from the completion deadline VR King Construction had agreed to—and Y2 Yoga began operating in its new location at that time.

78.     Over the fifteen month period of delay caused by VR King Construction, Y2 Yoga was unable to operate its business in the larger space it had been leasing in Cotswold Shopping Center, and it was unable to generate additional sales revenue and profits, as it had intended and as VR King Construction and Spend Management Solutions knew would result from a delay.

79.     During this fifteen month period, Y2 Yoga paid approximately $250,000 in rent and related charges for the space in Cotswold Shopping Center, in addition to the rent it was also paying on the smaller, adjacent space it occupied and operated in.

80.     In entering into the Construction Agreement, VR King Construction knew and understood that delay of the Project would cause Y2 Yoga to suffer injury and damages, including lost or diminished profits for the period of the delay and beyond.

81.     Similarly, as Y2 Yoga's construction project manager and business advisor, Spend Management Solutions knew and understood that delay of the Project would cause Y2 Yoga to suffer lost or diminished profits.

19

82.    Prior to the Project, Y2 Yoga was operating an established business with a track record of sales and operational performance, and Y2 Yoga's lost and diminished profits are ascertainable with reasonable certainty.

## ALLEGATIONS RELEVANT TO PIERCING THE CORPORATE VEIL AND FRAUDULENT CONDUCT BY MR. REID

83.    Mr. Reid exercises complete domination and control over the finances, policies, and business practices of VR King Construction, VR Investments, and Baranko Enterprise (collectively referred to as "Mr. Reid," unless the context indicates otherwise) to such a degree that all of these entities operate merely as an alter ego or instrumentality of Mr. Reid.

84.    The dealings among Mr. Reid, VR King Construction, VR Investments, and Baranko Enterprise are not arms-length transactions, but rather, are entered into for the purposes of concealing assets and defrauding creditors.

85.    Upon information and belief, none of these entities observe corporate formalities, properly account for and record financial transactions, or maintain reliable sets of books and records.

86.    In addition, each of them are inadequately capitalized, operate with no independent will, and are financially and otherwise dependent on Mr. Reid.

87.    Between February 2013 and January 2014, VR King Construction had little to no income from projects other than the Project for Y2 Yoga. On information and belief, the Project for Y2 Yoga was VR King Construction's first commercial project and its only commercial project during this time period.

20

88.     While purporting to work on the Project, Mr. Reid and VR King Construction converted and misappropriated funds that had been received from Y2 Yoga for the Project and have refused to account for their use.

89.     Mr. Reid directed Project funds out of VR King Construction and to himself or to his companies for improper and fraudulent purposes.

90.     On August 21, 2013, VR King Construction purchased certain real property located at 1720 Pegram St., Charlotte, NC 28205, Parcel ID 08116604 ("Property A").

91.     On November 13, 2013, VR King Construction purchased certain real property located at 1413 Catherine Simmons Ave., Charlotte, NC 28216, Parcel ID 07504430 (Property B").

92.     On January 16, 2014, VR King Construction purchased certain real property located at 626-710 Char Meck Lane, Charlotte, NC 28205 Parcel ID 159-061-78 ("Property C").

93.     Upon information and belief, VR King Construction purchased each of these properties in cash.

94.     In March 2014, VR Investments was formed with Mr. Reid as its registered agent and sole managing member.

95.     On April 9, 2014, Mr. Reid transferred Property A, Property B, and Property C to VR Investments for $0. In other words, no reasonably equivalent value was given to VR King Construction by VR Investments in exchange for these three properties having a combined tax value of approximately $650,000.

96.    In addition, according to publicly available records, on April 9th and 10th, VR Investments received three additional properties from Mr. Reid for $0: (1) 1228 Clanton Road, Charlotte, NC 28217, Parcel ID 14511303 ("Property D"); (2) 2586 Hemphill Street, Charlotte, NC 28208, Parcel ID 11708127 ("Property E"); and (3) 9809 E. W.T. Harris, Charlotte, NC 28227, Parcel ID 13504657 ("Property F").

97.    According to public records, Property D, Property E, and Property F have a combined tax value of approximately $285,100.

98.    In April 2014, there was a suspicious fire at Property C, located at 626 Char Meck Lane. After finding gasoline and matches inside the building, the Charlotte Mecklenburg Police concluded that the cause of the fire was arson. Police also found all of the building's doors locked and no sign of forced entry, determined that the only people with access to 626 Char Meck were Mr. Reid and Thais P. Moran, a woman who worked for him, and noted that the building had an alarm that was deactivated.

99.    Mr. Reid claims that shortly before the fire occurred he moved all of his business records and computers to the Char Meck location and that all of these records are now destroyed. One of the computers Mr. Reid claims to have moved to 626 Char Meck, however, was never found.

100.    Before this time, Mr. Reid was on notice of the dispute with Y2 Yoga over the Project, and, in fact, had already contacted a lawyer in March 2015.

101.     Baranko Enterprise maintains no bank accounts or other financial accounts of any kind, and has no cash, or working capital, or finances separate from those of Mr. Reid personally.

102.     VR King Construction or Mr. Reid pays taxes and other expenses of Baranko Enterprise and did so using funds received from Y2 Yoga instead of using them to complete the Project.

103.     Upon information and belief, Mr. Reid also used funds received from Y2 Yoga to purchase a new truck in August 2013, among other lavish personal spending of Project funds in 2013 and 2014.

104.     As bank account statements show, Mr. Reid regularly diverted funds received by VR King Construction to himself for personal use, for use by VR Investments, and Baranko Enterprise, as well as for use by three other entities that Mr. Reid owns and controls, Youth Hope International, LLC, and Mamas Caribbean Grill Inc.

105.     Mr. Reid commingles the funds and assets of all of the businesses he owns and controls with VR King Construction and Baranko Enterprise. For example, Mr. Reid regularly buys restaurant supplies and food for his Mama's restaurant out of the VR King Construction accounts, and he regularly buys construction supplies and equipment out of his Mama's restaurant accounts. In addition, Mr. Reid also makes "loans" among himself and his companies that are neither accounted for nor recorded, carry no interest, are not repaid, and are not arm's length transactions. Finally, Mr. Reid uses VR King Construction's resources and assets to improve or

renovate property owned by Baranko Enterprise—property Barano Enterprise received from Mr. Reid through $0 transfers—for no consideration.

106.    Mr. Reid also transferred funds received by Y2 Yoga for the Project from a VR King Construction account to an account for Youth Hope International, a non-profit corporation. Youth Hope International is not a legitimate non-profit and this transfer of funds had no proper purpose, and instead, was made to hide assets from Y2 Yoga and divert them for Mr. Reid's own use. In addition, Mr. Reid publicly claims that Youth Hope International controls real property that is actually owned and controlled by Baranko Enterprise, and Mr. Reid diverts funds raised in Youth Hope International's name to himself for his own personal use.

107.    VR King Construction, VR Investments, and Baranko Enterprise each maintain and use Property F—a residential property at 9809 E. W.T. Harris Boulevard, Charlotte, North Carolina 28227 which is currently owned by VR Investments—as their principal office location. Mr. Reid also uses Property F as a residence. On information and belief, neither Mr. Reid, VR King Construction, nor Baranko Enterprise pay for the use of this location as a residence or office.

108.    Finally, as bank and other records show, Mr. Reid has tried to conceal his siphoning and diversion of Project funds by, among other things, using a false social security number to open bank accounts, and by closing bank accounts and transferring funds to newly opened bank accounts either for one of his existing business entities or for an newly-formed entities. Mr. Reid directed and undertook this activity at the time he was abandoning the Project in early 2014 (e.g., by forming

24

VR Investments in March 2014)—and has continued to do so during this lawsuit (e.g., by forming a new Mamas restaurant entity, Mamas Caribbean Bar & Grill Inc., in November 2017).

109. The circumstances alleged and present in this lawsuit justify disregarding the separateness of Mr. Reid and the legal entities he owns and controls, and piercing the corporate veil to hold Mr. Reid, VR King Construction, VR Investments, and Baranko Enterprise jointly and severally liable for all injuries and damages suffered by Y2 Yoga.

### FIRST CLAIM FOR RELIEF
### Breach of Contract Against Mr. Reid, VR King Construction, VR Investments, and Baranko Enterprise

110. Y2 Yoga incorporates and restates all allegations of the complaint in this paragraph.

111. VR King Construction breached the construction contract entered into with Y2 Yoga by, among other things:

- failing to furnish labor, materials, and equipment to the Project;

- failing to have the resources, capacity, expertise, and know-how to perform and complete the Project;,

- failing to obtain and maintain adequate insurance;

- failing to obtain the promised bonding for the Project;

- failing to complete the Project by the required time;

- failing to supervise the Project;

- failing to submit accurate payment applications;

- failing to pay subcontractors and suppliers;

- failing to coordinate work to be performed by subcontractors, and suppliers;

- failing to complete and abandoning the Project; and

- failing to assist with the transition of the Project to a replacement contractor.

112.    As a result of VR King Construction's breach of contract, Y2 Yoga has suffered damages in excess of $25,000, including but not limited to amounts paid by Y2 Yoga to complete the Project and to repair or replace VR King Construction's defective work, incidental and consequential damages, costs, and expenses, including additional or increased amounts paid to the architect, engineers, consultants, suppliers, and for storage of supplies and materials.

113.    In addition, as a result of VR King Construction's breach of contract, in particular, the failure to complete the Project by the agreed-upon deadline, Y2 Yoga was unable to operate its business in the new, larger, renovated location and incurred additional and increased rent and other expenses, and suffered and continues to suffer lost or diminished profits because of the fifteen month delay.

114.    Y2 Yoga also seeks payment of all other amounts it is entitled to under the contract terms and applicable law, including but not limited to interest, costs, and attorneys' fees.

115.    Mr. Reid, VR King Construction, VR Investments, and Baranko Enterprise are jointly and severally liable for all damages and injury to Y2 Yoga.

## SECOND CLAIM FOR RELIEF
### Gross Negligence Against Mr. Reid, VR King Construction, VR Investments, and Baranko Enterprise

116.    Y2 Yoga incorporates and restates all allegations of the complaint in this paragraph.

117.    By and through its dealings with Y2 Yoga, before, during, and after abandoning the Project, as detailed throughout the complaint, Mr. Reid and VR King Construction owed Y2 Yoga a legal duty, an obligation separate and apart from any contractual duties owed, to conform to a standard of conduct to protect Y2 Yoga against unreasonable risks.

118.    Mr. Reid and VR King Construction failed to conform to the applicable standard of conduct—a standard which is evidenced by general contractor licensing requirements, industry practices and standards, building codes and ordinances, and state and federal laws—and breached the duty owed to Y2 Yoga.

119.    Mr. Reid and VR King Construction acted willfully, wantonly, or with reckless indifference for this standard of conduct and the rights of Y2 Yoga.

120.    Damage to Y2 Yoga was a reasonably foreseeable result of Mr. Reid and VR King Construction's breach of duty, and Y2 Yoga was, in fact, damaged in an amount exceeding $25,000 as a result of Mr. Reid and VR King Construction's breach of duty and gross negligence.

121.    As a result of Mr. Reid and VR King Construction's gross negligence, Y2 Yoga also seeks and is entitled to recover punitive damages under N.C. Gen. Stat. § 1D-15, because the conduct at issue involved fraud, malice, or willful and wanton

conduct, including by Mr. Reid, who condoned, directed, or participated in the conduct.

122.    Mr. Reid and VR King Construction are also liable to Y2 Yoga for all other amounts Y2 Yoga is entitled to under applicable law, including but not limited to interest, costs, and attorneys' fees.

123.    Mr. Reid, VR King Construction, VR Investments, and Baranko Enterprise are jointly and severally liable for all damages and injury to Y2 Yoga.

## THIRD CLAIM FOR RELIEF
### Fraud Against Mr. Reid, VR King Construction, VR Investments, Baranko Enterprise, and Spend Management Solutions

124.    Y2 Yoga incorporates and restates all allegations of the complaint in this paragraph.

125.    Mr. Reid and VR King Construction knew at the time they submitted the bid for the Project in February 2013 that the actual cost of the Project would be greater than the amount stated in the bid and that the information stated in the bid was inaccurate, false or misleading.

126.    In particular, Mr. Reid and VR King Construction knew that the amounts represented to Y2 Yoga were less than the amount that would be required to pay subcontractors, suppliers, and others to complete the Project. For example, even though the electrical subcontractor's actual bid was $198,000 (and later adjusted to $228,000), Mr. Reid and VR King Construction represented the "Electrical – Subcontract" amount as $149,000.

127.     Spend Management Solutions secretly provided competitive bidding information to Mr. Reid and VR King Construction and concealed this and other material information about the Project from Y2 Yoga, as a participant in the fraud.

128.     Mr. Reid, VR King Construction, and Spend Management Solutions knowingly provided inaccurate, false or misleading information intending to deceive Y2 Yoga into selecting Mr. Reid and VR King Construction as the general contractor for the Project and induce it to enter into the construction contracts.

129.     Mr. Reid, VR King Construction, and Spend Management Solutions knew in the summer of 2013 when Mr. Reid and VR King Construction submitted information about the costs and schedule of the Project to Y2 Yoga that the information submitted was inaccurate, false, or misleading.

130.     Mr. Reid and VR King Construction knowingly provided this inaccurate, false, or misleading information to induce Y2 Yoga to enter into the Construction Agreement. Spend Management Solutions knew that the information was inaccurate, false, or misleading but concealed the true circumstances from Y2 Yoga.

131.     Mr. Reid, VR King Construction, and Spend Management Solutions knew that the items and information described in the change orders issued to Y2 Yoga were inaccurate, false, or misleading.

132.     Mr. Reid, VR King Construction knowingly provided the inaccurate, false, or misleading information in the change orders intending to deceive Y2 Yoga and to induce Y2 Yoga to approve and enter into the change orders as amendments to the construction contracts.

133.    Spend Management Solutions knew that the information was inaccurate, false, or misleading but concealed the true circumstances from Y2 Yoga.

134.    Mr. Reid, VR King Construction, and Spend Management Solutions knew that the information presented to Y2 Yoga in the Schedules of Values was inaccurate, false, or misleading.

135.    Mr. Reid and VR King Construction knowingly provided this inaccurate, false or misleading information in the Schedule of Values intending to deceive Y2 Yoga about the costs and status of the Project. Spend Management Solutions knew that the information was inaccurate, false, or misleading but concealed the true circumstances from Y2 Yoga.

136.    Mr. Reid and VR King Construction intentionally misrepresented the "scheduled value" and "work completed" in the Schedule of Values submitted to Y2 Yoga.

137.    Spend Management Solutions knew that the information was inaccurate, false, or misleading but concealed the true circumstances from Y2 Yoga.

138.    In addition, Mr. Reid and VR King Construction inserted new items into the Schedule of Values without requesting a change order and manipulated other amounts.

139.    For example, in the March 2014 Schedule of Values, Mr. Reid and VR King Construction inserted an additional $10,000 for "Profit & Overhead."

140.    And in the March 2014 Schedule of Values, Mr. Reid and VR King Construction increased the scheduled amount for "Electrical-Subcontract" to

30

$198,000, the amount of the electrical subcontractor's original bid from over a year earlier, even though by that time the electrical subcontractor had increased its bid to $228,000.

141.    In the May 2014 Schedule of Values, Mr. Reid and VR King Construction increased the "Electrical – Subcontract" amount to $228,000. But to conceal the increase, Mr. Reid and VR King Construction deleted amounts for general labor, roofing upgrades, storefront installation, operable partition, acoustical ceiling, flooring, wall painting, restroom accessories, soil exploration, and refilling and compacting with stone and manipulated nearly every other amount listed on the Schedule of Values.

142.    Using the methods described above, Mr. Reid and VR King Construction fraudulently billed Y2 Yoga for, among other scheduled items: superintendent, plan printing, building permitting, signage allowance, millwork materials, storefront materials, roof leader allowance, tool rental, demolition, concrete, masonry, carpentry materials, door material and labor, paint, restroom accessories, plumbing, electrical, fire alarm, interior walls, acoustical ceiling materials, flooring materials, shower and cold room tile, vertical platform, heating, ventilation and air conditioning, fire sprinklers, electrical, soil investigation, refilling and compaction of soil, and dumpster containers.

143.    To further conceal the inaccuracies of the Schedule of Values, Mr. Reid and VR King Construction employed trickery and deception on site at the Project,

such as billing for rough-in electrical work and then installing drywall over the studs to conceal the fact that the electrical work had not been performed.

144.    Finally, throughout the Project, Mr. Reid and VR Construction concealed from Y2 Yoga material information concerning the secret receipt of competitive bidding information from Spend Management Solutions, and the transfer of funds received by Y2 Yoga for the Project and assets acquired using funds obtained from the Project between and among Mr. Reid and his businesses for personal and pecuniary gain and for no purpose related to the Project whatsoever.

145.    The concealments and misrepresentations of Mr. Reid, VR King Construction, and Spend Management Solutions described above were reasonably calculated to deceive Y2 Yoga.

146.    The concealments and misrepresentations described above were done with intent to deceive and with the intent that Y2 Yoga act upon them.

147.    Y2 Yoga reasonably relied upon and was in fact deceived by the concealments and misrepresentations of Mr. Reid, VR King Construction, and Spend Management Solutions. Among the actions taken in reliance on their concealments and misrepresentations, Y2 Yoga selected VR King Construction as the general contractor for the Project, entered into the Demolition Agreement and Construction Agreement, made or approved payments to VR King Construction, approved change orders, and incurred other expenses to operate its business based on anticipated completion of the Project.

148.    Y2 Yoga suffered compensatory damages in excess of $25,000 proximately caused by Mr. Reid, VR King Construction, and Spend Management Solutions' concealments and misrepresentations.

149.    As a result of Mr. Reid, VR King Construction, and Spend Management Solution's fraud, Y2 Yoga also seeks and is entitled to recover punitive damages under N.C. Gen. Stat. § 1D-15, because the conduct at issue involved fraud, malice, or willful and wanton conduct, including by Mr. Reid, who condoned, directed, or participated in the conduct.

150.    Mr. Reid, VR King Construction, and Spend Management Solutions are also liable to Y2 Yoga for all other amounts Y2 Yoga is entitled to under applicable law, including but not limited to interest, costs, and attorneys' fees.

151.    Mr. Reid, VR King Construction, VR Investments, and Baranko Enterprise are jointly and severally liable for all damages and injury to Y2 Yoga, along with Spend Management Solutions.

### FOURTH CLAIM FOR RELIEF
### Negligent Misrepresentation Against Mr. Reid, VR King Construction, and Baranko Enterprise

152.    Y2 Yoga incorporates and restates all allegations of the complaint in this paragraph.

153.    In the alternative to Y2 Yoga's fraud claim, Y2 Yoga asserts a claim of negligent misrepresentation against Mr. Reid and VR King Construction.

154.    Mr. Reid and VR King Construction, in the course of operating a business as a general contractor, provided false and incorrect information to Y2 Yoga

33

concerning the Project, its costs, use of funds, timeframe to completion, and the nature and scope of work to be done.

155.    Mr. Reid and VR King Construction were obligated to but did not exercise reasonable or competent care with respect to gathering, preparing, and communicating this information to Y2 Yoga in its bid, schedule of values, change orders, as well as in other oral and written communications.

156.    Mr. Reid and VR King Construction supplied the false information to Y2 Yoga for its benefit and guidance and to influence its decisions to start and continue the Project and make payments, and Y2 Yoga justifiably relied on the information supplied by Mr. Reid and VR King Construction to do so.

157.    In addition, Mr. Reid and VR King Construction provided false and incorrect information to others working on the Project, including the architect hired by Y2 Yoga, Spend Management Solutions, and subcontractors.

158.    It was reasonably foreseeable that the carelessly and incompetently provided false and incorrect information provided to others would be relied on to the detriment of Y2 Yoga and cause damage to Y2 Yoga.

159.    As a result of Mr. Reid and VR King Construction's negligent misrepresentations, Y2 Yoga has been damaged in an amount in excess of $25,000.00.

160.    Mr. Reid and VR King Construction are also liable to Y2 Yoga for all other amounts Y2 Yoga is entitled to under applicable law, including but not limited to interest, costs, and attorneys' fees.

34

161.    Mr. Reid, VR King Construction, VR Investments, and Baranko Enterprise are jointly and severally liable for all damages and injury to Y2 Yoga.

### FIFTH CLAIM FOR RELIEF
### Violation of N.C.G.S §§ 39-23.1 to 39-23.12
### Fraudulent Transfer/Voidable Transactions Act
### against Mr. Reid, VR King Construction, VR Investments, and Baranko Enterprise

162.    Y2 Yoga incorporates and restates all allegations of the complaint in this paragraph.

163.    Mr. Reid and VR King Construction used funds fraudulently obtained from Y2 Yoga for the Project to purchase certain real property located in Charlotte, Mecklenburg County, North Carolina, as well as to obtain other assets located in North Carolina.

164.    Mr. Reid formed VR Investments with the fraudulent intent of using it as a vehicle to conceal assets from Y2 Yoga.

165.    Shortly after forming VR Investments, Mr. Reid transferred Property A, Property B, Property C, Property D, Property E, and Property F, having a combined tax value of nearly $1 million at the time to VR Investments for no reasonably equivalent value.

166.    Mr. Reid, VR King Construction, and VR Investments made and participated in each of these transfers with the intent to hinder, delay, or defraud Y2 Yoga, to conceal the assets shortly after its debt to Y2 Yoga was incurred and for no legitimate purpose whatsoever.

167.     In an attempt to conceal the illegitimacy of the transactions, Mr. Reid hired legal counsel to assist him with the formation of VR Investments and the property transfers, but, upon information and belief, Mr. Reid did not inform his legal counsel of the fraudulent circumstances of the transactions.

168.     Mr. Reid, VR King Construction, and VR Investments were insolvent, as defined by N.C.G.S. § 39-23.2, at the time of the transfers.

169.     After the transfers, Mr. Reid, VR King Construction, and VR Investments continue to retain possession and control of all of the properties.

170.     As a result of the fraudulent transfers by Mr. Reid, VR King Construction and VR Investments, Y2 Yoga is entitled to avoidance of the transfers to the extent necessary to satisfy Y2 Yoga's claims, as well as other equitable and legal relief the Court deems just and proper, including attachment, an injunction against further disposition by Mr. Reid, VR King Construction and VR Investments or receivership to take charge of the assets.

171.     Mr. Reid, VR King Construction, VR Investments, and Baranko Enterprise are jointly and severally liable for all damages and injury to Y2 Yoga.

### SIXTH CLAIM FOR RELIEF
### Conversion Against Mr. Reid, VR King Construction, VR Investments, and Baranko Enterprise

172.     Y2 Yoga incorporates and restates all allegations of the complaint in this paragraph.

173.     Mr. Reid and VR King Construction received funds from Y2 Yoga to be used for the Project.

174.     In particular, between February 2013 and January 2014, Mr. Reid and VR King Construction received by seventeen separate checks or wire transfers into a single VR King Construction account amounts totaling over $1.4 million.

175.     These funds were the property of Y2 Yoga, and Mr. Reid and VR King Construction wrongfully deprived Y2 Yoga of the benefit of these funds.

176.     Rather than paying these funds to subcontractors and suppliers, as contemplated by the parties in the construction contracts, Mr. Reid and VR King Construction exercised unauthorized control over and wrongfully converted these funds.

177.     As a result, Y2 Yoga suffered compensatory damages in excess of $25,000.

178.     In addition, as a result of Mr. Reid and VR King Construction's conversion, Y2 Yoga also seeks and is entitled to recover punitive damages under N.C. Gen. Stat. § 1D-15, because the conduct at issue involved fraud, malice, or willful and wanton conduct, including by Mr. Reid, who condoned, directed, or participated in the conduct.

179.     Mr. Reid and VR King Construction are also liable to Y2 Yoga for all other amounts Y2 Yoga is entitled to under applicable law, including but not limited to interest, costs, and attorneys' fees.

180.     Mr. Reid, VR King Construction, VR Investments, and Baranko Enterprise are jointly and severally liable for all damages and injury to Y2 Yoga.

## SEVENTH CLAIM FOR RELIEF
### Breach of Contract Against Spend Management Solutions

181.    Y2 Yoga incorporates and restates all allegations of the complaint in this paragraph.

182.    Y2 Yoga contracted with Spend Management Solutions to acts as its construction project manager for the Project, to advise Y2 Yoga on business aspects of the Project, prepare bid documents for the Project, assist Y2 Yoga in the selection of a general contractor, communicate and coordinate with Mr. Reid, VR King Construction, and the architect during the Project and represent Y2 Yoga's interests with respect to the construction, review proposed change orders and payment applications submitted by VR King Construction, and advise Y2 Yoga regarding change orders, payment applications, and the progress of the Project.

183.    In exchange for these promised services, Y2 Yoga paid Spend Management Solutions a monthly fee.

184.    Spend Management Solutions materially breached the agreement by, among other things, secretly providing bid information to Mr. Reid and VR King Construction, failing to review proposed change orders and payment applications submitted by Mr. Reid and VR King Construction for accuracy and support and by approving proposed change orders and payment applications that were inaccurate, unsupported, or fraudulent.

185.    As a result of Spend Management Solutions' material breach of contract, Y2 Yoga has suffered damages in excess of $25,000.

186.    In addition, Spend Management Solutions' knew and understood that its breach of contract or failure to perform its project management, consulting and advisory services for the Project reasonably and foreseeably would result in losses and damage to Y2 Yoga from the Project, including increased construction expenses, Project overpayments, as well as lost and diminished profits and other incidental and consequential damages from the fifteen month delay of the Project.

187.    Y2 Yoga also seeks payment of all other amounts it is entitled to under the contract terms and applicable law, including but not limited to interest, costs, and attorneys' fees.

### EIGHTH CLAIM FOR RELIEF
### Negligent Misrepresentations Against Spend Management Solutions

188.    Y2 Yoga incorporates and restates all allegations of the complaint in this paragraph.

189.    In the course of operating a business as a business consultant, project manager, and advisor, provided false and incorrect assurances and information to Y2 Yoga concerning its qualifications and competence to evaluate and analyze the Project, its costs, requirements, and the nature and scope of work to be done.

190.    In addition, Spend Management Solutions also provided false, incomplete, and incorrect information to Y2 Yoga about the actual costs and status of the Project during and after the Project.

191.    Spend Management Solutions was obligated to but did not exercise reasonable or competent care with respect to gathering, preparing, and communicating this information to Y2 Yoga.

192.    Spend Management Solutions supplied the false, incomplete, and incorrect information to Y2 Yoga for its benefit and guidance and to influence its decisions to start and continue the Project, and Y2 Yoga justifiably relied on the information supplied by Spend Management Solutions to enter into construction contracts, and make payments for work not earned or performed, among other things.

193.    As a result of Spend Management Solutions' negligent misrepresentations, Y2 Yoga had been damaged in an amount in excess of $25,000.00.

194.    Spend Management Solutions also is liable to Y2 Yoga for all other amounts Y2 Yoga is entitled to under applicable law, including but not limited to interest, costs, and attorneys' fees.

### NINTH CLAIM FOR RELIEF
**Breach of Fiduciary Duty/Constructive Fraud Against
Spend Management Solutions**

195.    Y2 Yoga incorporates and restates all allegations of the complaint in this paragraph.

196.    Prior to the Project, Spend Management Solutions served as a business consultant and advisor to Y2 Yoga, providing guidance on Y2 Yoga's strategic plans and advising Y2 Yoga on business decisions based on Y2 Yoga's best interest.

197.    As part of this advisory relationship, Spend Management Solutions gained and maintained a relationship of trust and confidence with Y2 Yoga.

198.    Spend Management Solutions took advantage of its fiduciary position to advise Y2 Yoga to serve as construction project manager for the Project, despite Spend Management Solution's lack of experience and know-how in managing

commercial construction matters, and to advise Y2 Yoga to select Mr. King and VR King Construction to be the general contractor for the Project, notwithstanding the personal relationship between Mr. King and Spend Management Solutions' project manager.

199.    Spend Management Solutions did not act in good faith and wrongfully benefitted from its conduct by obtaining increased or additional monthly fees from Y2 Yoga as project manager and using the Project, to Y2's detriment and without due regard for Y2 Yoga's best interests, to try to gain experience, credibility, and contacts, to allow it to market and market its construction project management service to other clients.

200.    As Y2 Yoga's construction project manager, Spend Management Solutions breached and violated its fiduciary duties of loyalty and care by secretly providing bidding information to Mr. Reid and VR King Construction and concealing the true circumstances about the costs and status of the Project from Y2 Yoga.

201.    As a result of Spend Management Solutions conduct, Y2 Yoga was injured and suffered damages exceeding $25,000.

202.    As a result of Spend Management Solutions' breach of fiduciary duty and constructive fraud, Y2 Yoga also seeks and is entitled to recover punitive damages under N.C. Gen. Stat. § 1D-15, because the conduct at issue involved fraud, malice, or willful and wanton conduct.

203.    Spend Management Solutions is also liable to Y2 Yoga for all other amounts Y2 Yoga is entitled to under applicable law, including but not limited to interest, costs, and attorneys' fees.

### TENTH CLAIM FOR RELIEF
### Civil Conspiracy Against Mr. Reid, VR King Construction, VR Investments, Baranko Enterprise, and Spend Management Solutions

204.    Y2 Yoga incorporates and restates all allegations of the complaint in this paragraph.

205.    Mr. Reid, VR King Construction, VR Investments, and Baranko Enterprise, on one hand, and Spend Management Solutions, on the other hand, agreed with one another by their words and conduct to commit unlawful acts or lawful acts in an unlawful way, as described throughout the complaint in connection with the Project.

206.    Through this common scheme, in connection with the Project, and based on their respective roles as general contractor and construction project manager, Mr. Reid, VR King Construction, VR Investments, Baranko Enterprise, and Spend Management Solutions combined to commit fraud, and to breach contractual duties, common law duties of care, fiduciary duties, and statutory duties owed to Y2 Yoga.

207.    As part of their common scheme, among other things, it was understood and agreed that Spend Management Solutions would secretly provide competitive bidding information to Mr. Reid and VR King Construction, enabling Mr. Reid and VR King Construction to avoid the due diligence and other work required to analyze the Project and provide a firm bid, that Spend Management Solutions would advise

42

Y2 Yoga to select Mr. Reid and VR King Construction as the general contractor and not question or scrutinize the information provided by Mr. Reid and VR King Construction throughout the Project, that all of them would conceal and not disclose Mr. Reid and VR King Construction's lack of know-how and resources, substandard and defective construction work, inadequate supervision, and misappropriation of funds to Mr. Reid and his business entities.

208.    As a result of the civil conspiracy between Mr. Reid, VR King Construction, VR Investments, Baranko Enterprise, and Spend Management Solutions, Y2 Yoga suffered compensatory damages in excess of $25,000.

209.    In addition, as a result of Mr. Reid, VR King Construction, VR Investments, Baranko Enterprise, and Spend Management Solutions' conspiracy, Y2 Yoga also seeks and is entitled to recover punitive damages under N.C. Gen. Stat. § 1D-15, because the conduct at issue involved fraud, malice, or willful and wanton conduct, including by Mr. Reid, who condoned, directed, or participated in the conduct.

### ELEVENTH CLAIM FOR RELIEF
#### Violation of N.C. Gen. Stat. § 75-1.1
#### Unfair and Deceptive Trade Practices Act
#### Against Mr. Reid, VR King Construction, VR Investments, Baranko Enterprise, and Spend Management Solutions

210.    Y2 Yoga incorporates and restates all allegations of the complaint in this paragraph.

211.    As set forth throughout the complaint, Mr. Reid, VR King Construction, VR Investments, and Spend Management Solutions engaged in unfair or deceptive

acts or practices in violation of N.C.G.S. § 75-1.1 with respect to Y2 Yoga and the Project, including:

      a.     Obtaining property by false pretenses;

      b.     Committing common law fraud;

      c.     Engaging in trickery, artifice, and deceit for pecuniary gain;

      d.     Making negligent misrepresentations;

      e.     Participating in fraudulent transfers; and

      f.     Committing breach of contract with aggravating factors.

212.     Mr. Reid, VR King Construction, VR Investments, and Spend Management Solutions acts were in or affected commerce.

213.     As a result of Mr. Reid, VR King Construction, VR Investments, and Spend Management Solutions' unfair and deceptive trade practices, Y2 Yoga has suffered damages in the principal amount in excess of $25,000, to be trebled, as required by N.C.G.S. § 75-16.

214.     In addition, Y2 Yoga seeks an award of attorneys' fees as permitted by N.C.G.S. § 75-16.1, as well as all other amounts it is entitled to under applicable law, including interest and costs.

WHEREFORE, Y2 Yoga prays as follows:

A.     That the Court pierce the corporate veils such that Mr. Reid, VR King Construction, VR Investments, and Baranko Enterprise will be jointly and severally liable for all damages suffered and amounts of any kind whatsoever that may be or are awarded to Y2 Yoga;

B.     That judgment be entered in favor of Y2 Yoga and against all of the Defendants for compensatory, incidental, and consequential damages, as applicable and permitted, in an amount to be proven at trial;

C.   That Y2 Yoga be awarded punitive damages against Mr. Reid, VR King Construction, VR Investments, Baranko Enterprise, and Spend Management Solutions;

D.   That Y2 Yoga be awarded treble damages against Mr. Reid, VR King Construction, VR Investments, and Spend Management Solutions under N.C.G.S. § 75-16;

E.   That Y2 Yoga be awarded reasonable attorneys' fees, as permitted by the construction contract, under N.C.G.S. § 75-16.1, as well as any other applicable law;

F.   That the fraudulent transfers by and among Mr. Reid, VR King Construction, VR Investments, and Baranko Enterprise be avoided and the assets attached to satisfy amounts owed to Y2 Yoga;

G.   That Y2 Yoga be allowed to elect its remedies upon the reading of the verdict;

H.   For an award of prejudgment and post-judgment interest and costs;

I.   For a trial by jury on all issues so triable; and

J.   For such other and further relief as this Court deems just and proper.

Dated this 6th day of March, 2018.

RABON LAW FIRM, PLLC

David G. Guidry
N.C. State Bar No. 38675
225 E. Worthington Ave., Suite 100
Charlotte, NC 28203
704.247.3248
dguidry@usfraudattorneys.com
*Counsel for Defendant Y2 Yoga Cotswold, LLC*

## VERIFICATION

I have read Y2 Yoga Cotswold, LLC's Second Amended Verified Complaint, and regarding the allegations of which Y2 Yoga has personal knowledge, I know or believe the allegations to be true, and, regarding the allegations of which Y2 Yoga does not have personal knowledge, I believe them to be true based on specified information, records, or both.

_____
Tanner Bazemore
President, Y2 Yoga Cotswold, LLC

State of North Carolina
County of _Mecklenburg_

Sworn to and subscribed before me by _Tanner Bazemore_ this _27th_ day of _February_ 2018.

Date:
(Official Seal)

Official Signature of Notary

_Cornelia C. Drake_
Printed Name

My commission expires: _9/22/2022_



## CERTIFICATE OF SERVICE

I certify that as of the date below a copy of Y2 Yoga Cotswold, LLC's Second

Amended Verified Complaint was served on the following counsel for the parties via

U.S. Mail postage prepaid and addressed as follows:

John Barringer
Christopher Campbell
MCANGUS, GOUDELOCK & COURIE
6302 Fairview Road, Suite 700
Charlotte, NC 28210-2267
*Counsel for Defendants Vinroy W. Reid, VR King Construction LLC, and VR Investments, LLC*

Gillian S. Crowl
SWIFT, CURRIE, MCGHEE & HIERS, LLP
1355 Peachtree St. N.E., Suite 300
Atlanta, Georgia, 30309
*Counsel for Defendant Spend Management Solutions, LLC*

Robert L. Burchette
JOHNSTON, ALLISON & HORD
1065 E Morehead St
Charlotte, NC 28204
*Counsel for Third-Party Defendant Warco Construction, Inc.*

Michael J. Kitson
GOLDING HOLDEN & POPE, L.L.P.
6701 Carmel Rd
Charlotte, NC 28226
*Counsel for Third-Party Defendant Triangle Electric of Lake Norman, Inc.*

Erik M. Rosenwood
Nancy Litwak
HAMILTON STEPHENS STEELE AND MARTIN
525 N Tryon St., Suite 1400
Charlotte, NC 28202
*Counsel for Third-Party Defendant C.L. Helt Architect, Inc.*

M. Shane Truett
CENTRAL LAW GROUP, PLLC
6769 Albemarle Rd.
Suite B
Charlotte, NC 28212
*Counsel for Third-Party Defendant Jeronimo Vega-Espriella d/b/a JJV Construction*

March 6, 2018.

David G. Guidry

# Exhibit "E"

# *Edwards v. Edwards*

Court of Appeals of North Carolina

June 9, 1994, Heard In The Court Of Appeals ; April 18, 1995, Filed

No. 9322DC1139

**Reporter**

118 N.C. App. 464 *; 456 S.E.2d 126 **; 1995 N.C. App. LEXIS 289 ***

PHILLIP KENNETH EDWARDS, Plaintiff, v. LORETTA S. EDWARDS, Defendant.

**Prior History:** [***1] Davidson County No. 92CvD920. Appeal by defendant from order filed 17 August 1993 by Judge George T. Fuller in Davidson County District Court.

**Disposition:** Affirmed.

# Case Summary

### Procedural Posture

Plaintiff ex-husband filed an action against defendant ex-wife that sought specific performance of a separation agreement. The ex-wife counterclaimed that there was no breach of the agreement and that the agreement was null and void. The Davidson County District Court (North Carolina) ruled that the agreement was valid and that the ex-wife breached the agreement. The ex-husband filed a motion for attorneys' fees, which was granted.

### Overview

The ex-wife alleged that the original judgment of the trial court operated as a bar to the subsequent award of attorneys' fees to the ex-husband. The ex-wife argued that under the principles of res judicata and collateral estoppel the ex-husband was required to have brought his claim for attorneys' fees in the action for specific performance. The court held that the ex-husband's indemnification claim was not barred by the principle of collateral estoppel because the claim was totally dissimilar to any issue previously presented to the trial court. The court also held that the ex-husband's claim for indemnification had not accrued at the time of the filing of his complaint for specific performance and therefore the ex-husband's claim for indemnification was not one which should have been adjudicated at the time of the specific performance claim. Finally, the court held that joinder of the non-accrued indemnification claim was not mandatory and therefore the trial court committed no error.

### Outcome

The court affirmed the judgment of the trial court.

# LexisNexis® Headnotes

Business & Corporate
Compliance > ... > Contracts Law > Contract
Conditions & Provisions > Indemnity Clauses

Civil Procedure > Remedies > Costs &
Attorney Fees > General Overview

Family Law > ... > Marital
Agreements > Postnuptial & Separation
Agreements > General Overview

## *HN1*[⬇] **Contract Conditions & Provisions, Indemnity Clauses**

A provision establishing indemnification for attorneys' fees between the parties to a separation agreement has been specifically approved.

Civil Procedure > Judgments > Preclusion of
Judgments > Res Judicata

## *HN2*[⬇] **Preclusion of Judgments, Res Judicata**

A judgment, if rendered upon the merits, constitutes an absolute bar to a subsequent action. It is a finality as to the claim or demand in controversy, concluding parties and those in privity with them, not only as to every matter which was offered and received to sustain or defeat the claim or demand, but as to any other admissible matter which might have been offered for that purpose. But where the second action between the same parties is upon a different claim or demand, the judgment in the prior action operates as an estoppel only as to those matters in issue or points controverted, upon the determination of which the finding or verdict was rendered.

Civil Procedure > ... > Preclusion of
Judgments > Estoppel > Collateral Estoppel

Civil Procedure > Judgments > Preclusion of
Judgments > General Overview

Civil Procedure > ... > Preclusion of
Judgments > Estoppel > General Overview

## *HN3*[⬇] **Estoppel, Collateral Estoppel**

Collateral estoppel is applicable only (1) where the issues to be precluded are the same as those involved in the prior action, (2) where those actions were actually raised and litigated, (3) where the issues must have been relevant to the disposition of the prior action, and (4) where the determination of those issues must have been necessary to the resulting judgment.

Civil Procedure > ... > Preclusion of
Judgments > Estoppel > Collateral Estoppel

Civil Procedure > Judgments > Preclusion of
Judgments > General Overview

Civil Procedure > ... > Preclusion of
Judgments > Estoppel > General Overview

## *HN4*[⬇] **Estoppel, Collateral Estoppel**

A very close examination of matters actually litigated must be made in order to determine if the underlying issues are in fact identical. If they are not identical, then the doctrine of collateral estoppel does not apply.

Civil Procedure > Judgments > Preclusion of
Judgments > Res Judicata

Civil Procedure > Judgments > Preclusion of
Judgments > General Overview

## *HN5*[⬇] **Preclusion of Judgments, Res Judicata**

Under res judicata, a final judgment on the merits in a prior action by a court of competent jurisdiction operates as an absolute bar to a subsequent action involving the same claim, demand, and cause of action between the parties and their privies.

Civil Procedure > Judgments > Preclusion of Judgments > Res Judicata

*HN6*[⬇] **Preclusion of Judgments, Res Judicata**

When a plaintiff recovers a valid and final judgment, his or her original claim is extinguished and the rights granted pursuant to the judgment are substituted for it, and plaintiff's original claim is thus said to have "merged" with the judgment.

Civil Procedure > Judgments > Preclusion of Judgments > Res Judicata

*HN7*[⬇] **Preclusion of Judgments, Res Judicata**

Merger requires all damages resulting from a single wrong or cause of action to be recovered in one suit. Stated otherwise, a party suing for the breach of an indivisible contract must sue for all of the benefits which have accrued at the time of suit or be precluded from maintaining a subsequent action for installments omitted.

Civil Procedure > ... > Pleadings > Complaints > General Overview

Civil Procedure > Pleading & Practice > Pleadings > Impleader

*HN8*[⬇] **Pleadings, Complaints**

A defendant, as a third-party plaintiff, may cause a summons and complaint to be served upon a non-party who is or may be liable to him for all or part of the plaintiff's claim against him, and the traditional rule no longer precludes presentation of an indemnity claim prior to accrual.

Civil Procedure > Pleading & Practice > Pleadings > Joinder of Claims &

Remedies > General Overview

Civil Procedure > Parties > General Overview

Civil Procedure > Parties > Joinder of Parties > General Overview

*HN9*[⬇] **Pleading & Practice, Joinder of Claims & Remedies**

A party asserting a claim for relief may join, either as independent or as alternate claims, as many claims, legal or equitable, as he has against an opposing party, *N.C. R. Civ. P. 18(a)*, and whenever a claim is one heretofore cognizable only after another claim has been prosecuted to a conclusion, the two claims may be joined in a single action. *N.C. R. Civ. P. 18(b)*.

Civil Procedure > ... > Pleadings > Counterclaims > Compulsory Counterclaims

Civil Procedure > ... > Pleadings > Counterclaims > General Overview

Civil Procedure > ... > Pleadings > Crossclaims > General Overview

*HN10*[⬇] **Counterclaims, Compulsory Counterclaims**

A counterclaim is compulsory when it is in existence at the time of the serving of the pleading and when it arises out of the same transaction or occurrence.

Civil Procedure > Judgments > Preclusion of Judgments > Res Judicata

Contracts Law > Remedies > Specific Performance

Civil Procedure > Judgments > Preclusion of Judgments > General Overview

_HN11_[⬇]   **Preclusion of Judgments, Res Judicata**

The res judicata doctrine precluding relitigation of the same cause of action has been held inapplicable where the performance of an act was sought in one action and a money judgment in the other.

## Headnotes/Summary

### Headnotes

**1. Judgments § 208 (NCI4th)-- res judicata--collateral estoppel--distinguished**

While _res judicata_ precludes a subsequent action based on the same claim, collateral estoppel bars subsequent determination of the same issue, even though the action may be premised upon a different claim.

_Am Jur 2d, Judgments §§ 514-639_.

**2. Judgments § 274 (NCI4th)-- collateral estoppel--identity of issues--claim not barred**

Plaintiff's indemnification claim was not barred by the principle of collateral estoppel where plaintiff and defendant executed a separation agreement which provided that the defaulting party would indemnify the other for expenses, including attorney fees, involved in collecting financial obligations or enforcing rights; plaintiff filed suit seeking specific enforcement of the provision requiring that the homeplace be listed for sale; defendant was ordered to list the homeplace in a judgment signed on 20 April; and plaintiff filed a motion on 7 July seeking reimbursement under the indemnity clause for the attorney fees incurred in prosecuting the suit for specific performance.

Plaintiff's indemnification claim is totally dissimilar to any issue previously presented; the earlier trial determined only the validity of the separation agreement and plaintiff's entitlement to specific performance.

_Am Jur 2d, Judgments §§ 415 et seq._

**3. Judgments § 298 (NCI4th)-- enforcement of separation agreement--separate action for attorney fees--res judicata**

Plaintiff's claim was not barred by _res judicata_ where plaintiff and defendant executed a separation agreement which provided that the defaulting party would indemnify the other for expenses, including attorney fees, involved in collecting financial obligations or enforcing rights; plaintiff filed suit seeking specific enforcement of the provision requiring that the homeplace be listed for sale; defendant was ordered to list the homeplace in a judgment signed on 20 April; and plaintiff filed a motion on 7 July seeking reimbursement under the indemnity clause for the attorney fees incurred in prosecuting the suit for specific performance. Although plaintiff contends that there was no indemnity claim to pursue until the court ruled that defendant had breached the agreement, under our Rules of Civil Procedure presentation of an indemnity claim prior to accrual is no longer precluded and joinder rules would have allowed plaintiff to pursue attorneys fees under the indemnity clause in the earlier action notwithstanding absence of accrual. However, _res judicata_ should be applied as fairness and justice require, permissive joinder here is simply a relaxation of the traditional indemnity rule, and joinder of a non-accrued indemnification claim was not mandatory. Moreover, there is a substantive distinction between plaintiff's specific performance action and his later motion for a monetary award of counsel fees; our courts have consistently rejected efforts to disallow awards of counsel fees under statutory entitlements not pursued in the earlier principal action; and plaintiff in his complaint prayed the trial court to grant such other relief as is

just and proper, with a copy of the separation agreement containing the indemnity clause being attached to the complaint. Given that broad language, plaintiff asserted a claim for indemnification in the earlier action and later merely particularized that claim. Finally, defendant had full notice that recoupment was available to plaintiff and neither fairness nor justice are offended by failing to rule that plaintiff's claim ought to have been pled with particularity in the specific performance complaint.

*Am Jur 2d, Divorce and Separation §§ 749-818.*

**Counsel:** Wyatt, Early, Harris, Wheeler & Hauser, L.L.P., by A. Doyle Early, Jr., High Point, NC, for plaintiff-appellee.

C. Richard Tate, Jr., High Point, NC, for defendant-appellant.

**Judges:** JOHN, Judge; Judges GREENE and MCCRODDEN concur. Judge MCCRODDEN concurred prior to 15 December 1994.

**Opinion by:** JOHN

# Opinion

 [*466]  [**127] JOHN, Judge.

Defendant appeals the trial court's order granting plaintiff's motion for attorneys' fees. She contends the award is barred by entry of the court's earlier judgment dated 20 April 1993. We disagree.

Relevant background information is as follows: Plaintiff and defendant were married 4 September 1965 and separated 26 September 1991. On or about the latter date, they executed a separation agreement (the Agreement) which provided defendant would list the parties' homeplace for sale and that the proceeds would be divided equally between the two. The Agreement [***2] further provided:

> 17. <u>INDEMNITY</u>
> If either party for any reason fails to perform his or her financial or other obligations to the other party hereunder, and as a result thereof, the party incurs any expense, including reasonable attorney's fees, to collect the same or otherwise enforce his or her rights with respect thereto, the defaulting party shall indemnify and hold him or her harmless from any such expense.

On 21 May 1992, plaintiff filed suit seeking specific performance of the Agreement, alleging defendant had refused to list the property for sale. Defendant answered and counterclaimed. She admitted failing to list the property, but denied this constituted a breach of the Agreement. Additionally, she [**128] prayed the Agreement be declared null and void.

At trial, Judge James M. Honeycutt ruled the Agreement was valid and that it had been breached by defendant. In a judgment signed 20 April 1993, he ordered defendant "to list the homeplace for sale as soon as practical and to divide the net proceeds equally."

On 7 July 1993, plaintiff filed a motion seeking reimbursement from defendant under the indemnity clause of the Agreement for attorneys' fees [***3] incurred in prosecuting his suit for specific performance. Defendant moved to dismiss plaintiff's motion. Upon hearing, the Honorable George T. Fuller denied defendant's motion and granted plaintiff's request for attorneys' fees.

Defendant appeals.

[*467] The sole issue raised herein is whether the 20 April 1993 judgment operates as a bar to the subsequent award of counsel fees to plaintiff. Defendant argues that under the principles of *res judicata* and collateral estoppel plaintiff was required to bring his claim for attorneys' fees in the action for specific performance. His failure to do so, she continues, precludes his later motion and the trial court erred in allowing it. We conclude the trial court did not commit error.

Plaintiff's 7 July 1993 motion was brought under Paragraph 17 of the Agreement entitled "Indemnity." "Ordinarily, the engagement in an indemnity contract is to make good and save the indemnitee harmless from loss or some obligation which he has incurred to a *third* party . . . ." 17 Strong's N.C. Index 4th *Indemnity* § 4, at 405-06 (1992) (emphasis added). Thus, indemnity generally "connotes liability for derivative fault." *Dixie Container Corp. v. [***4] Dale, 273 N.C. 624, 628, 160 S.E.2d 708, 711 (1968)* (citing *Edwards v. Hamill, 262 N.C. 528, 531, 138 S.E.2d 151, 153 (1964)).* Nonetheless, this Court has HN1[ ⬆ ] specifically approved a provision establishing indemnification for attorneys' fees between the parties to a separation agreement. *Edwards v. Edwards, 102 N.C. App. 706, 713, 403 S.E.2d 530, 533-34, disc. review denied*, 329 N.C. 787, 408 S.E.2d 518 (1991). In this context, we note defendant's focus herein is upon the timing of plaintiff's resort to the indemnity clause, and that she makes no argument contesting the validity thereof. *See Bromhal v. Stott, 116 N.C. App. 250, 254-56, 447 S.E.2d 481, 484-85 (1994), disc. review denied*, 339 N.C. 609, 454 S.E.2d 246 (1995) (Greene, J. dissenting in part) (dissent asserts attorneys' fees provision in separation agreement is invalid).

[1] In challenging the award of counsel fees to plaintiff, defendant relies upon the companion doctrines of *res judicata,* also referred to as "claim preclusion," and collateral estoppel, or "issue preclusion". *Hales v. N.C. Insurance Guaranty Assn., 337 N.C. 329, 333, 445 S.E.2d 590, 594 (1994).* Both doctrines involve a form [***5] of estoppel by final judgment. The distinction between the two has been stated as follows:

HN2[ ⬆ ] [A] judgment, if rendered upon the merits, constitutes an absolute bar to a subsequent action. It is a finality as to the claim or demand in controversy, concluding parties and those in privity with them, not only as to every matter which was offered and received to sustain or defeat the claim or demand, but as to any other admissible matter which might have been offered for that purpose . . . .

[*468] But where the second action between the same parties is upon a different claim or demand, the judgment in the prior action operates as an estoppel only as to those matters in issue or points controverted, upon the determination of which the finding or verdict was rendered.

*Thomas M. McInnis & Assoc., Inc. v. Hall, 318 N.C. 421, 427, 349 S.E.2d 552, 556 (1986)* (quoting *Cromwell v. County of Sac, 94 U.S. 351, 352-53, 24 L. Ed. 195, 197-98 (1877)).* Thus, while in the first circumstance *res judicata* precludes a subsequent action based on the same claim, collateral estoppel in the latter instance bars subsequent determination of the same issue, even though the action [***6] may be premised upon a different claim. *Hales, 337 N.C. at 333, 445 S.E.2d at 594.*

[2] We first discuss the issue of collateral estoppel. In *U.S. Fire Ins. Co. v. Southeast Airmotive Corp., 102 N.C. App. 470, 402 [**129] S.E.2d 466, disc. review denied*, 329 N.C. 505, 407 S.E.2d 553 (1991), this Court noted that

HN3[ ⬆ ] collateral estoppel is applicable only (1) where the issues to be precluded are the

same as those involved in the prior action, (2) where those actions were actually raised and litigated, (3) where the issues must have been relevant to the disposition of the prior action, and (4) where the determination of those issues must have been necessary to the resulting judgment.

*Id. at 472, 402 S.E.2d at 468* (citation omitted). We therefore held that "insofar as the issue of reimbursement [to an insurer of costs for defense] is distinct from the issue of coverage, the issue of reimbursement was neither raised nor disposed of in the prior action," *Id. at 473, 402 S.E.2d at 468*, and thus plaintiff's later claim seeking repayment of defense costs was not barred by application of collateral estoppel.

Further, in *Beckwith v. Llewellyn, 326 N.C. 569, 391 S.E.2d [***7] 189, reh'g denied, 327 N.C. 146, 394 S.E.2d 168 (1990)*, settlement of a wrongful death claim including payment of attorneys' fees was approved by court order. Plaintiff thereafter instituted suit against her original attorneys seeking damages based upon allegations including breach of fiduciary duty and malpractice. The trial court granted summary judgment in favor of defendants on the basis of collateral estoppel. Our Supreme Court reversed, reasoning as follows:

*HN4*[⬆] **[*469]** A very close examination of matters actually litigated must be made in order to determine if the underlying issues are in fact identical. If they are not identical, then the doctrine of collateral estoppel does not apply.
. . .
In the present case, plaintiff attempts to show that her former attorneys took advantage of the attorney-client relationship to her detriment; her former attorneys are now her adversaries. In the prior case, she and her attorneys, as client and fiduciaries, attempted to show that they had reached a reasonable settlement with the original defendants . . . The issues are not identical.

. . .

Thus, the "issues to be concluded," are not the **[***8]** same as those involved in the prior action and the "issues in question" are not identical to the "issues . . . actually litigated," in the prior action.

*Id. at 574-75, 391 S.E.2d at 191-92* (citation omitted).

In the case *sub judice*, as in the cases cited hereinabove, plaintiff's indemnification claim is totally dissimilar to any issue previously presented. In the earlier trial, the court determined only the validity of the Agreement and plaintiff's entitlement to specific performance. Plaintiff has not endeavored to relitigate these matters, but rather the separate and distinct issue of recoupment of attorneys' fees under the indemnity clause of the Agreement. As that issue was not litigated in the prior action, we conclude plaintiff's indemnification claim is not barred by the principle of collateral estoppel.

**[3]** Defendant's assertion of the application of *res judicata* requires a more extensive analysis. *HN5*[⬆] Under this doctrine, a final judgment on the merits in a prior action by a court of competent jurisdiction operates as "an absolute bar to a subsequent action involving the same claim, demand, and cause of action" between "the parties and their privies." *Gaither* **[***9]** *Corp. v. Skinner, 241 N.C. 532, 535, 85 S.E.2d 909, 911 (1955)*.

More specifically, defendant relies on the principle of merger, "a collateral aspect of *res judicata* which determines the scope of claims precluded from relitigation by an existing judgment." *Behr v. Behr, 46 N.C. App. 694, 698, 266 S.E.2d 393, 395-96 (1980)* (citations omitted). *HN6*[⬆] When a plaintiff recovers a valid and final judgment, his or

her original claim is extinguished and the rights granted pursuant to [*470] the judgment are substituted for it, and plaintiff's original claim is thus said to have "merged" with the judgment. *Restatement (Second) of Judgments § 18, Comment a* (1982).

*HN7*[⬆] Merger requires all damages resulting from a single wrong or cause of action to [**130] be recovered in one suit. *Bockweg v. Anderson, 333 N.C. 486, 492, 428 S.E.2d 157, 161 (1993)* (citing *Smith v. Pate, 246 N.C. 63, 67, 97 S.E.2d 457, 460 (1957))*. Stated otherwise, "a party suing for the breach of an indivisible contract must sue for all of the benefits which have accrued at the time of suit or be precluded from maintaining a subsequent action for installments omitted." *Behr, 46 N.C. App. at 698, 266 S.E.2d at 396* (citing *Restatement [***10] of Judgments § 62, Comment h* (1942)).

As a consequence of merger, defendant maintains, *res judicata* applies "'not only to the points upon which the court was required by the parties to form an opinion and pronounce a judgment, but to every point which properly belonged to the subject in litigation and which the parties *exercising reasonable diligence*, might have brought forward at the time and determined respecting it.'" *Painter v. Board of Education, 288 N.C. 165, 173, 217 S.E.2d 650, 655 (1975)* (quoting *Gibbs v. Higgins, 215 N.C. 201, 204-05, 1 S.E.2d 554, 557 (1939))*.

Defendant is correct that as a result of the doctrine of merger, "all matters, either fact or law, that were or should have been adjudicated in the prior action are deemed concluded." *Thomas M. McInnis & Assoc., Inc., 318 N.C. at 428, 349 S.E.2d at 556* (citations omitted). It is uncontroverted that plaintiff's claim for indemnification was not adjudicated in his specific performance lawsuit. The question remains whether the claim was one which "should have been adjudicated" therein.

Plaintiff justifies seeking indemnity by separate motion subsequent to the 20 April 1993 judgment

on the basis [***11] that an indemnity action traditionally may not be "instituted at law" until damages actually have been suffered. 17 Strong's Index 4th *Indemnity* § 23, at 420 (1992). Consequently, he argues, there existed "no claim or right to pursue any claim against the defendant pursuant to the contract of indemnity provision" until the court ruled defendant had breached the Agreement and until plaintiff had incurred counsel fees and expenses. "Then the plaintiff/indemnitee's claim vested," he concludes, "and could be properly brought, but not before."

[*471] While plaintiff accurately states traditional practice, since the enactment of our North Carolina Rules of Civil Procedure, 1967 N.C. Sess. Laws ch. 954,

*HN8*[⬆] "'a defendant, as a third-party plaintiff, may cause a summons and complaint to be served [upon a non-party] who is *or may be liable* to him for all or part of the plaintiff's claim against him,'" and the traditional rule no longer precludes presentation of an indemnity claim prior to accrual. *Heath v. Board of Commissioners, 292 N.C. 369, 375-76, 233 S.E.2d 889, 893 (1977)* (citing *N.C.R. Civ. P. Rule 14 (a)*)

.

Additionally, we note under our joinder rules, *HN9*[⬆] "[a] party [***12] asserting a claim for relief . . . may join, either as independent or as alternate claims, as many claims, legal or equitable, as he has against an opposing party," *N.C.R. Civ. P. Rule 18(a)*, and "whenever a claim is one heretofore cognizable only after another claim has been prosecuted to a conclusion, the two claims may be joined in a single action . . . ." *N.C.R. Civ. P. Rule 18(b)*.

It thus appears plaintiff's claim for indemnification had not accrued at the time of filing his complaint for specific performance in that neither had breach of the Agreement been determined nor had he incurred counsel fees. Notwithstanding absence of

accrual, our joinder rules would nonetheless have allowed plaintiff in the earlier action to pursue attorneys' fees under the indemnity clause. However, he did not do so. We therefore return to a consideration of whether plaintiff's failure to seek indemnification in the specific performance proceeding operates to bar his later petition for reimbursement of attorneys' fees.

The doctrine of *res judicata* has been the subject of much litigation, and its applicability is not without limitation. *Shelton v. Fairley, 72 N.C. App. 1, 5, 323 S.E.2d [***13] 410, 414 (1984)*, *disc. review denied*, 313 N.C. 509, 329 S.E.2d 394 (1985). This Court has previously acknowledged commentators' "support for the rule that judgments relied upon as creating a bar or preclusion are to be construed with strictness." *Id.* (citation omitted). Therefore, *res judicata* should "be applied in particular situations as fairness and justice **[**131]** require," and not "so rigidly as to defeat the ends of justice or so as to work an injustice." *46 Am. Jur. 2d Judgments § 522*, at 786-87 (1994). As our Supreme Court has observed:

> The court requires parties to bring forward the whole case, and will not, *except under special circumstances,* permit the same parties to open the same subject of litigation in respect to matters **[*472]** which might have been brought forward as part of the subject in controversy. . . The plea of *res adjudicata* applies, *except in special cases,* not only to the points upon which the court was required by the parties to form an opinion and pronounce a judgment, but to every point which properly belonged to the subject in litigation and which the parties, exercising reasonable diligence, might have brought forward at the time **[***14]** and determined respecting it.

*In re Trucking Co., 285 N.C. 552, 560, 206 S.E.2d 172, 178 (1974)* (citations omitted) (emphasis added).

Accordingly, we examine the case *sub judice* from the standpoint of "fairness" and "justice." Viewed in that light, we must determine whether plaintiff's pursuit of his indemnification motion subsequent to conclusion of his suit on the Agreement constitutes a "special circumstance" in which rigid application of the *res judicata* doctrine would be contrary to the principles of "justice." We hold the present instance is one in which *res judicata* is inapplicable.

First, while it is unquestioned our joinder rules would have allowed plaintiff to request counsel fee repayment in the specific performance suit, we view the policy of permissive joinder in this instance simply as a relaxation of the traditional rule that an indemnitee's right of action accrues only at the time loss has been incurred. Accordingly, we do not subscribe to the proposition that joinder of an non-accrued indemnification claim was mandatory. For example, in *U.S. Fire Ins. Co., 102 N.C. App. at 472, 402 S.E.2d at 468*, we determined a proceeding for recoupment **[***15]** of defense costs was not required to have been brought as a compulsory counterclaim in a previous action to determine insurance coverage. We observed:

> HN10[↑] A counterclaim is compulsory when *it is in existence at the time of the serving of the pleading* [and] when it arises out of the same transaction or occurrence . . . .

*Id.* (emphasis added).

Moreover, our Supreme Court impliedly held in *Heath* that an indemnity claim may *either* be joined with a principal action *or* brought separately. The Court therein stated: "when [an indemnitee] brings a separate suit against the person whose action caused the loss," the rule that the loss must have accrued continues to prevail. *Heath, 292 N.C. at 377, 233 S.E.2d at 893*.

**[*473]** Next, we perceive a substantial distinction between plaintiff's specific performance action seeking to require defendant to list the parties' real property for sale and plaintiff's later motion for a

monetary award in repayment of his counsel fees. *HN11*[↑] ] "'The res judicata doctrine precluding relitigation of the same cause of action has been held inapplicable where the performance of an act was sought in one action and a money judgment in the **[***16]** other.'" *Shelton, 72 N.C. App. at 8, 323 S.E.2d at 416* (citations omitted).

Further, in dealing with claims for attorneys' fees brought pursuant to various statutory entitlements, our courts have consistently rejected efforts to disallow awards not pursued in the earlier principal action. *See, e.g., Black v. Insurance Co., 42 N.C. App. 50, 53, 255 S.E.2d 782, 784, disc. review denied, 298 N.C. 293, 259 S.E.2d 910 (1979)* (*N.C. Gen. Stat. § 6-21.1*, providing for counsel fees upon "unwarranted refusal" to settle by insurance carrier, does not require an affirmative pleading for such an award as a separate claim in the complaint; rather, "plaintiff may properly move for an award of attorney's fees after a verdict has been returned in its favor"); *Upchurch v. Upchurch, 34 N.C. App. 658, 664-65, 239 S.E.2d 701, 705 (1977), disc. review denied, 294 N.C. 363, 242 S.E.2d 634 (1978)* and *Evans v. Evans, 111 N.C. App. 792, 799, 434 S.E.2d 856, 861, disc. review denied, 335 N.C. 554, 439 S.E.2d 144 (1993)* (*N.C. Gen. Stat. § 50-16.4*, allowing the award of counsel fees in alimony cases "*at any time*" dependent spouse is entitled to alimony *pendente lite*, "includes **[***17]** times subsequent to the determination of the issues in **[**132]** [the dependent spouse's] favor at the trial of [his or] her cause on its merits"); *In re Baby Boy Scearce, 81 N.C. App. 662, 663, 345 S.E.2d 411, 413, disc. review denied, 318 N.C. 415, 349 S.E.2d 590 (1986)* (under *N.C. Gen. Stat. § 50-13.6*, entitled "Counsel Fees in Actions for Custody and Support of Minor Children," a "request for attorney's fees may be properly raised by a motion in the cause subsequent to the determination of the main custody action"); *Surles v. Surles, 113 N.C. App. 32, 43, 437 S.E.2d 661, 667-68 (1993); see also In re Estate of Tucci, 104 N.C. App. 142, 145, 408 S.E.2d 859, 861-62 (1991), review dismissed as improvidently granted, 331 N.C. 749, 417 S.E.2d 236 (1992)* (fee petition pursuant to *N.C. Gen. Stat. § 6-21(2)* filed following unsuccessful will caveat proceeding) and *Tay v. Flaherty, 100 N.C. App. 51, 53, 394 S.E.2d 217, 218, disc. review denied, 327 N.C. 643, 399 S.E.2d 132 (1990)* (attorneys' fees sought under *N.C. Gen. Stat. § 6-19.1* subsequent to proceeding contesting agency decision denying food stamps).

**[*474]** Finally, defendant argues in her brief that plaintiff "had **[***18]** not plead anything regarding attorneys['] fees and had not argued nor raised any issue regarding any indemnification prior to Judge Honeycutt signing the judgment on 20 April 1993." However, plaintiff in his complaint prayed the trial court to "grant the plaintiff such other relief as is just and proper." A copy of the Agreement containing the indemnity clause was attached as Exhibit 1. Therefore, given the broad language of the complaint and reference to the attached Agreement, plaintiff thereby asserted a claim for indemnification in the earlier action, and his later motion merely particularized the specifics of that claim. *See Clark v. Clark, 301 N.C. 123, 134, n.4, 271 S.E.2d 58, 67, n.4 (1980)* (although defendant did not expressly demand possession of certain property in her counterclaim, she was nonetheless entitled to same given the broad nature of "relief . . . which the court deems just and proper"); *Highway Commission v. Thornton, 271 N.C. 227, 237, 156 S.E.2d 248, 256 (1967)* (a party's prayer for relief does not determine the relief to which he or she is entitled). In that event, defendant's *res judicata* argument is unavailing.

In addition, the Agreement was **[***19]** executed by the parties 26 September 1991 and plaintiff's complaint which referenced the Agreement attached thereto was personally served upon defendant 2 June 1992. Defendant had full notice that recoupment was available to plaintiff should legal fees and expenses be incurred in consequence of failure to perform under the Agreement. Neither "fairness" nor "justice," *46 Am. Jur. 2d Judgments § 522*, at 786-87 (1994), are offended by failing to rule plaintiff's claim for indemnification ought to

have been pled with particularity in his specific performance complaint.

For the reasons stated hereinabove, the trial court did not err by entry of its 17 August 1993 order awarding counsel fees to plaintiff.

Affirmed.

Judges GREENE and MCCRODDEN concur.

Judge MCCRODDEN concurred prior to 15 December 1994.

---

**End of Document**