# UNITED STATES BANKRUPTCY COURT
## WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION

| | | |
|---|---|---|
| In Re: | ) | |
| | ) | |
| V. R. KING CONSTRUCTION, LLC, | ) | Case No. 18-31635 |
| | ) | Chapter 7 |
| Debtor | ) | |
| _____ | ) | |
| | ) | |
| Y2 YOGA COTSWOLD, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | Adversary Proceeding No. 19-03047 |
| | ) | |
| v. | ) | |
| | ) | |
| V. R. KING CONSTRUCTION, LLC; | ) | |
| VINROY REID; WARREN TADLOCK as | ) | |
| Chapter 13 Trustee for Vinroy Reid; and | ) | |
| A. BURTON SHUFORD, as Chapter 7 | ) | |
| Trustee for V.R. KING CONSTRUCTION, LLC | | |
| | | |
| Defendants. | | |

## AMENDED AND SUPPLEMENTAL DECLARATION OF DAVID G. GUIDRY

I, David G. Guidry, state as follows:

1. My name is David G. Guidry. I am over twenty-one years of age and competent to make the statements contained in this declaration.

2. I am co-counsel to judgment creditor Y2 Yoga Cotswold, LLC in these bankruptcy proceedings. I also served as trial counsel to Y2 Yoga in the state court lawsuit which led to the judgment against Vinroy W. Reid and his companies, VR King Construction, LLC, VR Investments LLC, and Baranko Enterprises, Inc. (collectively referred to as Mr. Reid or the Debtors), as well as a related insurance coverage dispute filed by Mr. Reid's insurer, Nautilus Insurance Company, in federal court.

3. As counsel for Y2 Yoga in these various matters, I have personal knowledge of the information stated in this declaration.

4. I make this Amended and Supplemental Declaration to provide information to assist the Court in determining the reasonableness of the attorneys' fees to be awarded to Y2 Yoga. In this regard, I understand there are two sets of factors that may be applicable for the Court to consider, as well as other circumstances the Court may take into account.

5. One set of thirteen "non-exclusive" factors is outlined by N.C. Gen. Stat. § 6-21.6. These factors are as follows:

(1) the amount in controversy and the results obtained;

(2) the reasonableness of the time and labor expended, and the billing rates charged, by the attorneys;

(3) the novelty and difficulty of the questions raised in the action;

(4) the skill required to perform properly the legal services rendered;

(5) the relative economic circumstances of the parties;

(6) settlement offers made prior to the institution of the action;

(7) offers of judgment pursuant to Rule 68 of the North Carolina Rules of Civil Procedure and whether judgment finally obtained was more favorable than such offers;

(8) whether a party unjustly exercised superior economic bargaining power in the conduct of the action;

(9) the timing of settlement offers;

(10) the amounts of settlement offers as compared to the verdict;

(11) the extent to which the party seeking attorneys' fees prevailed in the action;

(12) the amount of attorneys' fees awarded in similar cases; and

(13) the terms of the business contract.

6. Another set of twelve factors has been adopted by the Fourth Circuit Court of Appeals and applied in *In re Abrams & Abrams, P.A.*, 605 F.3d 238 (4th Cir. 2010), among other cases. The *In re Abrams* factors are as follows:

(1) the time and labor required in the case;

(2) the novelty and difficulty of the questions presented;

(3) the skill required to perform the necessary legal services;

(4) the preclusion of other employment by the lawyer due to acceptance of the case;

(5) the customary fee for similar work;

(6) the contingency of a fee;

(7) the time pressures imposed in the case;

(8) the award involved and the results obtained;

(9) the experience, reputation, and ability of the lawyer;

(10) the "undesirability" of the case;

(11) the nature and length of the professional relationship between the lawyer and the client; and

(12) the fee awards made in similar cases.

7. Among the two sets of factors, there are several areas of overlap and a few factors that are unique to one set or the other. Below I will provide relevant information associated with each of the sets of factors. Attached hereto as Exhibit A is a "Summary Comparison of Attorneys' Fees Award Factors", which compares the N.C.G.S. 6-021.6 factors with the *Abrams* factors.

8. I have been a practicing attorney in North Carolina since 2008. Over this time, my legal practice has focused on commercial and business litigation. I received my J.D. from Vanderbilt University Law School in 2008 and began working as a business litigation associate with King & Spalding in Charlotte, NC. I worked with King & Spalding until early 2017, then joined a smaller firm primarily focused on federal *qui tam* lawsuits, before starting my own firm in 2018.

9. As part of my legal practice, I have handled many commercial and business litigation disputes for clients in state and federal courts in North Carolina and elsewhere around the country, through trial and on appeal, as well as represented clients in arbitration with the ICC, AAA, and FINRA, on a wide variety of issues including contract, real estate, construction, manufacturing, securities, trade secrets, and merger and acquisition-related disputes.

10. I am familiar with the billing rates of lawyers in North Carolina, specifically the Charlotte-Mecklenburg County area, for the type of legal services I provide and disputes similar to the matters I have handled for Y2 Yoga.

11. In late 2016, I was contacted by Tanner Bazemore with Y2 Yoga regarding the construction dispute between Y2 Yoga and Mr. Reid.

12. Y2 Yoga had hired Mr. Reid to act as general contractor to renovate and remodel a large space in Cotswold Shopping Center adjacent to a smaller yoga studio space that Y2 Yoga occupied and operated in at the time. A true and correct copy of the construction contract has been submitted as Exhibit N to the Complaint filed herein [Doc. No. 1].

13. Per the terms of the construction contract, the agreed-upon cost for the project was $1.4 million with a firm completion date of about four months. The construction contract also included an indemnity provision permitting the non-breaching party to recover its attorneys' fees from the breaching party.

14. At the time Mr. Bazemore contacted me, Y2 Yoga was represented in the litigation by the law firm of Horack Talley and had recently refiled its complaint against Mr. Reid and his companies in Mecklenburg County Superior Court.

15. Although Y2 Yoga wanted to continue to pursue its claims, the studio was facing mounting legal bills that made it difficult to continue the case. The studio was still suffering financially from paying the additional costs to repair and complete the project with a replacement general contractor and being out of business for fifteen months as a result of the construction delays.

16. As I was informed by Mr. Bazemore, Horack Talley would not handle the case under any fee arrangement other than billing by the hour. Given the complexities of the issues in the case

3

and the anticipated legal fees and expenses, Y2 Yoga was concerned about having the financial wherewithal to pursue its claims under the current fee structure.

17. The amount in controversy in the state court lawsuit equaled approximately $2.4 million based on two categories of damages: (1) approximately $1.7 million in repair and completion costs; and (2) approximately $700,000 in lost profits associated with the fifteen month delay in opening the studio in the new space.

18. In my experience, cases like Y2 Yoga's seeking to recoup damages from a general contractor are typically difficult to litigate, and, here, the prospect of recovery from Mr. Reid and his companies seemed highly uncertain, as assets would be difficult to locate and execute on, even in the event of a favorable judgement. The primary identifiable assets that would be available for recovery were several parcels of real estate owned and controlled by Mr. Reid through his companies with an estimated market value of $2 million.

19. Shortly after Y2 Yoga refiled its state court lawsuit, Mr. Reid's insurance company, Nautilus Insurance, filed a declaratory judgment action in federal court in Charlotte disputing Mr. Reid's claim for insurance coverage for the construction issues complained of by Y2 Yoga. In its coverage action against Mr. Reid, Nautilus included Y2 Yoga as a defendant, requiring Y2 Yoga to participate in a second court proceeding arising from the construction dispute. As I understand, however, despite its denial of liability coverage, Nautilus paid all of Mr. Reid's costs of defense in the state court case, giving Mr. Reid a substantial economic advantage over Y2 Yoga throughout the litigation.

20. These circumstances negatively impacted the desirability of the case and made it difficult for Y2 Yoga to retain counsel to help it pursue its claims. The Debtors later filing of bankruptcy during trial only added to and exacerbated the issues that already made a case such as this undesirable for the client and attorneys and have made it difficult and expensive to pursue claims and obtain a recovery from a general contractor such as the Debtors.

21. As part of Y2 Yoga's search for replacement counsel, shortly after refiling the complaint, Mr. Bazemore reached out to certain investors and others who had a connection with the studio, including me, seeking guidance for continuing the lawsuit and obtaining alternate representation.

22. After some months of discussion about handling the case with Mr. Bazemore and Y2 Yoga's investors, I was hired as counsel by Y2 Yoga around April 2017. My relationship with Y2 Yoga as a client began with my engagement in April 2017 to represent Y2 Yoga in the state court construction dispute against Mr. Reid and defending Y2 Yoga in the federal court coverage dispute filed by Nautilus. Prior to handling this matter for Y2 Yoga I had not represented or provided legal services to Y2 Yoga.

23. The fee arrangement between me and Y2 Yoga included a flat fee of $19,000, plus a potential contingency fee that would not be incurred by Y2 Yoga unless and until Y2 Yoga collected a recovery as part of the dispute. The contingency fee was set as a percentage of the recovery obtained and ranged from 35-45% depending on the phase of the case when the recovery amount was obtained. Based on a recovery after trial, Y2 Yoga would incur a contingency fee of 45% of the amount ultimately recovered.

24. Because I agreed to handle the case under a contingent fee arrangement, where Y2 Yoga would pay, and I would receive, legal fees only from the ultimate recovery received by Y2 Yoga, I have not billed Y2 Yoga for the value of my ongoing legal services (with the exception of the initial flat fee of $19,000) from the time I began representing Y2 Yoga in the spring of 2017 to the present, including for my time assisting and participating in the bankruptcy proceedings.

25. After the Debtors filed for bankruptcy, Y2 Yoga and I amended the fee agreement to reflect the continued work and representation that would be required to pursue the claims and any possible recovery in bankruptcy and to confirm that this work continued as part of the final phase of our fee agreement.

26. A true and correct copy of the engagement agreement between my firm and Y2 Yoga is attached as Exhibit C to the Complaint [Doc. No. 1].

27. Representing Y2 Yoga and pursuing recovery on its claims has involved substantial time and effort. I estimate that I have spent approximately 1,355 hours on this matter from April 2017 to the present, including my representation of Y2 Yoga in the state court lawsuit, defending the federal court coverage action by Nautilus, and continuing to pursue relief and a recovery in this Court.

28. Below is a summary of the work I have performed on Y2 Yoga's behalf, including an estimate of the hours for each item:

29. After substituting as counsel, I performed continued evaluation of the case, conducted witness interviews and studied relevant documents, as well as performed research on seeking prejudgment attachment of assets, and subsequently drafted and filed a verified, amended complaint to support prejudgment attachment of assets. Estimated time: 75 hours.

30. After answering the Complaint, Mr. Reid filed third-party contribution and indemnity claims against the project architect and several subcontractors. Many of those third-party defendants filed motions to dismiss. I prepared for and attended hearings on those motions. Estimated time: 10 hours.

31. I initiated the prejudgment attachment proceedings, which included preparation of an affidavit from the client, securing an adequate bond, obtaining initial and subsequent orders of attachment from the Court, and coordinating with the sheriff for execution of those orders. Estimate time: 80 hours.

32. The discovery period in the case ran from approximately June 2017 to August 2018. It included the following:

- Serving three rounds of written discovery on Mr. Reid and his companies and obtaining a motion to compel answers to interrogatories and document production. Estimated time: 20 hours.

- Serving two rounds of written discovery on co-defendant Spend Management Solutions and resolving various objections and responses. Estimated time: 20 hours.

5

- Responding to written discovery and gathering and producing documents requested of Y2 Yoga. Estimated time: 30 hours.

- Serving and negotiating productions for approximately ten (10) subpoenas to obtain various bank, phone, and email records of Mr. Reid and his companies. Estimated time: 10 hours.

- Reviewing the approximately seven to eight thousand documents and emails produced by the parties, third parties, and non-parties, including substantial time reviewing Mr. Reid's bank records due to incomplete or non-existent construction company records to otherwise account for the use of construction funds and to analyze various real estate and asset transfers. Estimated time: 200 hours.

- Preparing, taking, and defending depositions of eleven (11) party and non-party witnesses ((1) Tanner Bazemore of Y2 Yoga; (2) Sean Williams and (3) Walter Rasby of Spend Management Solutions, (4) Mr. Reid, (5) Thais Moran (VR King Construction's office manager), (6) Bruce Downing (Y2 Yoga's replacement general contractor), (7) Tim Johnston (architect), (8) Hakeem Bailey (VR King Construction's project manager), (9) Nick Harris (Y2 Yoga's damages expert), (10) Amor Camatcho (Mr. Reid's construction expert), and (11) Steve Moore (Y2 Yoga's construction expert). As part of these depositions, there were over 200 exhibits introduced by the parties and substantial time was spent preparing, selecting exhibits, and working with experts on their analysis. Estimated time: 250 hours.

- Amending the complaint based on information learned in discovery to add Baranko Enterprise, another business entity controlled by Mr. Reid, as a defendant. Estimated time: 40 hours.

- Initiating the prejudgment attachment process for Baranko Enterprise, obtaining appropriate orders from the Court and coordinating with the sheriff on execution of those orders. Estimated time: 10 hours.

33. In addition, I prepared for and attended a full-day mediation involving the numerous parties and third parties in the case and various insurer representatives. Estimated time: 10 hours.

34. Prior to trial, I prepared for and defended summary judgment motions. Estimated time 20 hours.

35. Throughout the case, I also handled a number of additional procedural or miscellaneous tasks including negotiating with opposing counsel over designating a judge, scheduling depositions, setting various hearing dates as well as a trial date, meeting and conferring with opposing counsel regarding various discovery issues, and conducting limited informal settlement discussions. Estimated time: 30 hours.

36. In connection with the federal insurance coverage dispute, I conducted discovery, convinced Nautilus to dismiss several of its declaratory claims disputing coverage (benefitting Mr. Reid), which eventually lead the parties to agree to stay the federal proceedings pending the outcome of the state court lawsuit. Estimated time: 40 hours.

37. Trial preparation consumed over two weeks' time. Estimated time: 100 hours.

38. The state court trial lasted approximately six weeks (from 9/18 to 11/2) with a week-long break for a judicial conference and few additional days off for various reasons. During trial, eight witnesses testified and approximately 150 trial exhibits were introduced. Estimated time: 330 hours.

39. During trial, Mr. Reid and his companies filed for bankruptcy protection, and I began working with Jim Henderson, Y2 Yoga's bankruptcy counsel, to continue to pursue recovery on Y2 Yoga's behalf during and after the state court trial.

40. In connection with the bankruptcy, I have attended various hearings, researched legal issues, coordinated with Mr. Henderson on motions, reviewed and revised motions and pleadings, conferred with the trustee and bankruptcy administrators and Debtors' counsel, testified on behalf of Y2 Yoga, prepared two declarations, and performed other related work to continue to pursue recovery for Y2 Yoga. Estimated time: 80 hours.

41. The most novel and difficult issues in the state court litigation were: (i) the factual and legal issues related to the repair and completion of the construction project, the terms of several change orders, and proving breach by Mr. Reid under the circumstances; (ii) issues related to piercing the corporate veil, the commingling of assets, asset transfers and other financial transactions by the Debtors and related to the construction project; (iii) the loss or destruction of nearly all construction and business records by the Debtors; and (iv) pursuing and defending the attachment orders throughout the litigation to try to ensure that there would be assets available for any potential recovery.

42. Navigating and resolving these issues, which were being vigorously disputed and contested by the Debtors (and the various third-parties added to the case), required thorough and committed efforts to develop a factual record for the various transactions at issue based on real estate records and bank records, architect report, and available emails and construction records, consultation with construction, engineering, and financial experts, and Y2 Yoga's replacement general contractor, as well as working through the various attachment rules and procedures with the clerk, the Court, and the sheriff.

43. The commitment of my time and effort to representing Y2 Yoga has been substantial. During the few months leading up to and through trial in the late summer and fall of 2018, I was precluded from working on any other legal matters for other clients, because the case required all of my available time and effort. Trying the case also required a substantial sacrifice of many personal, family, and other work commitments and obligations I had over several months.

44. Litigating the state court case also imposed considerable time pressures. The attachment process and Mr. Reid's challenges to it were all highly time-sensitive proceedings and had to be handled with little or no advance notice. The deposition schedule, which included eleven depositions, was compressed after document discovery issues were resolved and motion to compel rulings had been issued. Mr. Reid contested Y2 Yoga's request for a brief continuance of the trial date but then filed bankruptcy during jury selection. And Mr. Reid's bankruptcy filing required Y2 Yoga to move quickly to hire bankruptcy counsel and obtain relief from the automatic stay while also preparing to begin trial.

45. Throughout the litigation, the settlement discussions among the parties (and Mr. Reid's insurers) were extremely limited. Based on the limited discussions that did take place, in my view, the dynamic and dispute between Mr. Reid and his insurer created many obstacles and disincentives to Mr. Reid engaging in meaningful settlement discussions. While Mr. Reid's defense was being paid for by his insurer, the insurer had no apparent interest in contributing to any settlement.

46. I'm not aware of any settlement offers being made by Mr. Reid prior to the institution of the state court lawsuit. Nor do I recall any settlement offers or offer of judgment made by Mr. Reid while the lawsuit was pending, including at mediation.

47. At mediation, none of the parties or third parties (or their insurers), individually or collectively, made an offer of settlement to Y2 Yoga. At one point, the mediator told Y2 Yoga that Mr. Reid may consider contributing certain of his attached real estate as part of a settlement but the parties were unable to have productive discussions about such a transaction for a number of reasons, including Mr. Reid's refusal to disclose the amount of debt on such property secured by mortgages or other encumbrances on the properties to be conveyed.

48. I recall only one other settlement-related discussion. During the trial, Mr. Reid's insurance defense lawyer, Chris Campbell, approached me in the parking deck as we were leaving the courthouse for the day. Mr. Campbell asked me whether Y2 Yoga would consider settling the entire lawsuit in exchange for an **unsecured** $400,000 claim in bankruptcy against Mr. Reid (Mr. Reid's companies had not yet filed bankruptcy, as I recall). Y2 Yoga declined to have further discussions based on these terms.

49. At or near the end of the trial, Mr. Campbell told me that Mr. Reid and Nautilus (and Mr. Reid's other insurer, Western World, which had also contested coverage) had settled their insurance coverage disputes without involving Y2 Yoga. As I recall, Mr. Campbell told me, or I subsequently learned, that Nautilus and Western World had collectively paid Mr. Reid approximately $200,000 in exchange for cancellation of the policies and termination of any further defense and indemnity obligations to Mr. Reid. Neither Mr. Reid nor his insurers ever offered to contribute these funds to a settlement of Y2 Yoga's claims.

50. The state court judgment amount of approximately $575,000.00 obtained by Y2 Yoga based on the jury's verdict is more favorable than any settlement amount discussed at mediation or otherwise.

51. Without the efforts described above, Y2 Yoga likely would not have obtained a judgment against the Debtors, jointly and severally, as it did, and likely would not have the opportunity for a full recovery of the judgment from any one of the Debtors for a number of reasons. The Debtors claim to have insufficient liquid assets to satisfy the judgment, notwithstanding Mr. Reid's receipt of settlement funds and other amounts from his insurers, and the collection of any judgment was expected to depend on the receipt of proceeds from the execution on the Debtors' real estate. In addition, the attachment was effective to ensure the real estate remained available to satisfy any judgment, because during the litigation Mr. Reid's attempted sale of one of his properties was halted because of the attachment order.

52. Applying the agreed-upon contingency fee percentage of 45% to the anticipated recovery based on Y2 Yoga's amended claim amount (which includes the accrual of post-judgment interest) yields a contingency fee of approximately $278,000.00.

53. Based on the 1,355 hours I've worked on the case, this contingent fee would equate to an hourly fee of about $205, well below my standard hourly rate of $350 and the hourly rates charged for comparable work in this field of practice. Based on my research, courts in North Carolina and in this district have found hourly rates ranging from $250 to $550 to be reasonable.

54. By way of further comparison, had Y2 Yoga obtained legal representation under an hourly fee arrangement at my standard hourly rate of $350 per hour, Y2 Yoga would have incurred legal fees of $475,000 associated with the 1,355 hours of legal services that have been required to date.

55. Based on my experience as a business litigator in North Carolina and knowledge of billing rates and contingency fee arrangements, as well as research of relevant legal authority, the contingency fee arrangement here, which ranged from 35-45% depending on the phase of the case, is reasonable and fair and comparable to the fees and fee arrangements in similar cases, given the subject matter, my experience level, and the work performed on Y2 Yoga's behalf. Moreover, the particular complexities and risks of this case, especially the risks concerning the enforceability and collectability of any judgment, also supports the reasonableness and fairness of a 45% contingency fee award for Y2 Yoga.

56. I believe the work I have performed and time spent on behalf of Y2 Yoga in these matters has been and continues to be reasonable under the circumstances and was necessary to litigate the issues raised by the case and try to obtain a recovery for Y2 Yoga.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on September 28, 2020.

_____
David G. Guidry

# EXHIBIT A

## Summary Comparison of Attorneys' Fee Award Factors
*N.C. Gen. Stat. § 6-21.6 and In re Abrams*

**The characteristics of the case**

| NC Gen. Stat. § 6-21.6 factors | *In re Abrams* factors |
|---|---|
| (3) the novelty and difficulty of the questions raised in the action | (2) the novelty and difficulty of the questions presented |
| | (10) the "undesirability" of the case |

**The lawyer's work and skill**

| NC Gen. Stat. § 6-21.6 factors | *In re Abrams* factors |
|---|---|
| (2) the reasonableness of the time and labor expended, and the billing rates charged, by the attorneys | (1) the time and labor required in the case |
| (4) the skill required to perform properly the legal services rendered | (3) the skill required to perform the necessary legal services |
| | (4) the preclusion of other employment by the lawyer due to acceptance of the case |
| | (6) the contingency of a fee |
| | (7) the time pressures imposed in the case |
| | (9) the experience, reputation, and ability of the lawyer |
| | (11) the nature and length of the professional relationship between the lawyer and the client |

**The efforts at voluntary resolution and relative position of the parties**

| NC Gen. Stat. § 6-21.6 factors | *In re Abrams* factors |
|---|---|
| (5) the relative economic circumstances of the parties | |
| (6) settlement offers made prior to the institution of the action | |
| (7) offers of judgment pursuant to Rule 68 of the North Carolina Rules of Civil Procedure and whether judgment finally obtained was more favorable than such offers | |

| | |
|---|---|
| (8) whether a party unjustly exercised superior economic bargaining power in the conduct of the action | |
| (9) the timing of settlement offers | |
| (10) the amounts of settlement offers as compared to the verdict | |

**The results and comparison to other cases**

| NC Gen. Stat. § 6-21.6 factors | *In re Abrams* factors |
|---|---|
| (1) the amount in controversy and the results obtained | (5) the customary fee for similar work |
| (11) the extent to which the party seeking attorneys' fees prevailed in the action | (8) the award involved and the results obtained |
| (12) the amount of attorneys' fees awarded in similar cases | (12) the fee awards made in similar cases |

**The contract at issue**

| NC Gen. Stat. § 6-21.6 factors | *In re Abrams* factors |
|---|---|
| (13) the terms of the business contract | |